UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| NATIONAL POST OFFICE COLLABORATIVE, *et al.*,<br>        *Plaintiffs,*<br>        *v.*<br>PATRICK R. DONAHOE*, et al.*,<br>        *Defendants.* | Civil No. 3:13cv1406 (JBA)<br><br>October 28, 2013 |

## RULING GRANTING PLAINTIFFS' MOTION
## FOR A PRELIMINARY INJUNCTION

On September 25, 2013, Plaintiffs filed the Complaint [Doc. # 1] in this action and simultaneously filed [Doc. # 2] an ex parte application for a temporary restraining order and motion for a preliminary injunction, seeking to enjoin Defendants from proceeding with the sale of the United States Post Office located at 421 Atlantic Street in Stamford, Connecticut (the "Atlantic Street Station"). Judge Bryant issued a temporary restraining order on September 26, 2013.[1] (*See* Order Granting Temporary Restraining Order [Doc. # 13].) Plaintiffs now seek a preliminary injunction to enjoin the sale of the Atlantic Street Station until Defendants comply with their obligations under the National Environmental Policy Act ("NEPA"), the National Historic Preservation Act ("NHPA"), and other statutes. For the reasons that follow, the preliminary injunction is GRANTED pursuant to NEPA.

---

[1] Because Defendants are publicly known to be represented by the United States Attorney, the Court declined to issue an ex parte order, and Defendants' counsel participated in the hearing.

I.      **Background**

A.      **Facts**

Plaintiffs, two nonprofit entities and an individual residing in Stamford, filed [Doc. # 26] a five-count Amended Complaint on October 9, 2013, seeking to enjoin Defendants, the United States Postal Service ("USPS") and its Postmaster General, from disposing of the Atlantic Street Station.

Plaintiff National Post Office Collaborative is an organization dedicated to "preserving and retaining public ownership of and access to historic community post offices." (Am. Compl. ¶ 2.) Plaintiff Center for Art and Mindfulness, Inc. ("CAM"), is a nonprofit organization that sought to purchase the Atlantic Street Station in a 2012 auction "with the intent of preserving the Atlantic Street Station and its architecture and art for the benefit of the residents" of Stamford. (*Id.* ¶ 3.) Plaintiff Kaysay H. Abrha is a resident of Stamford and was a user of the Atlantic Street Station before it closed. (*Id.* ¶ 4.)

1.      *The Atlantic Street Station*

There is no dispute among the parties that the Atlantic Street Station, constructed in 1916, is a historic building that in 1985 was listed by the United States Department of the Interior on the National Register of Historic Places. (*See* Am. Compl. ¶¶ 10, 14; National Register of Historic Places Inventory—Nomination Form ("Nomination Form"), Rouse Aff. Ex. 1 [Doc. # 35-1].) The Nomination Form describes its American-Italianate architecture as representing an unusual style choice for a New England post office, and it appears to be one of the last post offices individually designed before the

government adopted a policy in 1915 to save money by standardizing the construction planning and producing similar post offices in many communities.  (*Id.* at 3.)

The building contains several notable features that make it "an important city landmark" in Stamford.  (*See* Historic American Buildings Survey ("Building Survey"), Saunders Aff. Ex. B [Doc. # 37] at 1.)  Set on a pink granite base, the Atlantic Street Station was constructed with steel framing and buff-colored masonry accented with glazed polychrome terra cotta tile.  A raised entrance plaza with monumental granite steps and balustrades leads to a landscaped terrace enclosed on two sides by the projecting wings of the structure.  (*Id.*)  The plaza "features two symmetrically placed bronze and white glass lantern-type light fixtures of monumental scale as well as unusual and interesting plantings." (Nomination Form at 2.)

The southern façade of the building facing Federal Street "is a massive composition of ten, eight-foot wide, arched windows and an arched door opening." (Building Survey at 7.)  The exterior is adorned with a series of wall projections and setbacks with "terra cotta quoining at each turning."  (*Id.*)  The architect submitting the National Register of Historic Places nomination form in 1985 noted that as the development of nearby high rises continued, "this space defined by the plaza, street, and Post Office will become more important as an urban space and reminder of the older scale and history of the City." (Nomination Form at 3.)

With monumental high ceilings and a red-clay tile hipped roof sitting atop a dark brown bracketed wood projecting eave, the building is approximately forty-feet high. (Building Survey at 1.)  The interior lobby runs the width of the terrace with brown clay tile floors trimmed in pink and white marble "and features high vaulted plaster ceiling

(said to have been originally decorated with colorful murals) and bronze vestibules and windows." (Nomination Form at 3.)  A major addition was constructed in the rear of the original building in 1939, which was "sympathetic in detailing and only slightly less elaborate in exterior ornamentation." (*Id.* at 2.)

Plaintiffs alleged in the Amended Complaint that New Deal-era art, including interior bronze work by Tiffany & Co. of New York, adorns the interior of the Atlantic Street Station (*see* Am. Compl. ¶ 13), but USPS disagrees.  An affidavit submitted by Cece Saunders, the President of Historical Perspectives and a cultural resources consultant and archaeologist with thirty-one years of experience, explains that in 1997 when her firm completed a Historic American Building Survey for filing with the Library of Congress, it did "not list the Tiffany and Company statue and grilles as being in" the Atlantic Street Station but "only list[ed] these items as reportedly included in the original furnishings." (Saunders Aff. ¶ 3 & Ex. 14.)  At the request of USPS, Saunders revisited the site on October 4, 2013 to look for the Tiffany's bronze work in the lobby, but found no statue in any lobby area and "only one possible edge of a brass grille that may be from the original installation but it is only partially visible at the top of the center lobby's southernmost service window." (*Id.* ¶ 4. & Ex. C)  Because the grille is not operational, it was not examined for the 1997 report or during Saunders's recent visit, and, accordingly, "cannot be identified with any certainty." (*Id.*).

During this recent visit, Saunders sought to verify the findings of the 1997 report and found that the "character defining features" of the Atlantic Street Station, "which were overwhelmingly in the public spaces are extant," including the granite foundation with two carved 1915 plaques on the façade, the exterior walls of glazed terra cotta blocks;

the hipped, red tile roof; the "[m]assive and rhythmic arched openings;" and two "large, handsome bronze lanterns," which "dominate the raised, balustrade forecourt on the Atlantic Street façade."[2] (Memorandum: Site Inspection, 2013, Saunders Aff. Ex. C [Doc. #29-2] at 1–2.)   In the interior lobby, "remains a five bay, plaster groin-and-barrel–vaulted room accented with high marble wainscoting and marble pilasters with plaster capitals."   (*Id.* at 2.)   The center lobby still features "two bronze and glass hexagonal vestibules and bronze fixed-sash arched windows" and "bronze postal boxes, manufactured by Stamford's own Yale and Towne."  (*Id.*)

USPS contends that contrary to Plaintiffs' allegations in the Amended Complaint, "there is no evidence in the record that there are murals in the Atlantic Street Station" or "that any interior feature of the Atlantic Street Station holds protection due to its listing on the National Register for Historic Places."  (Defs.' Proposed Findings of Fact [Doc. #45] ¶¶ 2–3 (citing Drew Backstrand Dept. Tr. [Doc. #28-1] at 231 and Nomination Form at 3).)

Despite its historic feature, Defendants contend that the Atlantic Street Station is now in poor repair and poses a health and safety risk to USPS employees from lead paint, plaster falling from the walls, mold and mildew, and a lack of hot running water.  (*See* Decl. of Anthony J. Basso II [Doc. #30] ("Basso Decl.") ¶ 3 & Ex. A.)  Defendants also contend that the property has been significantly underutilized, and the USPS had been

---

[2] On October 9, 2013, a worker at the site discovered that one of these lanterns had been "ripped off its pedestal and damaged, possibly by vandals" after the Atlantic Street station was closed on September 20, 2013.  *Historic Stamford post office lamp damaged*, STAMFORD ADVOCATE.COM, Oct. 10, 2013, http://www.stamfordadvocate.com/news/article/Historic-Stamford-post-office-lamp-damaged-4885863.php.

exploring the possible sale or redevelopment of the Atlantic Street Station since the mid-1990s, including two unsuccessful attempts in 1997 and 2007. (*See* Rouse Aff. ¶¶ 6–9.) USPS contends that as a result of these issues, it removed retail mail facilities from the Atlantic Street Station on September 20, 2013. (*See* Salamon Decl. [Doc. # 36] ¶¶ 3–4.)

2.     *The Sale of the Atlantic Street Station*

In 2012, USPS hired Cushman & Wakefield ("C&W") as its real estate agent to market the property, and C&W solicited bids on February 2, 2012. (*See* Am. Compl. ¶ 21; Fagan Decl. [Doc. # 31] ¶¶ 5–6.) Five offers for the property were submitted, and, in May 2012, C&W recommended that CAM's offer and two others receive further consideration. (*See* Fagan Aff. ¶ 8; Backstrand Depo. Tr. at 60.) The three bidders—CAM,[3] Cappelli Enterprises ("Cappelli"), and Entry Point Capital—submitted second-round bids. (*See* Fagan Aff. ¶ 10; Backstrand Depo. at 69, 105.) CAM's $5.5 million bid was the highest offer, and the parties entered into negotiations for the sale of the property in June 2012. (Am. Compl. ¶ 21; Fagan Aff. ¶ 10, Ex. B.) On June 22, 2012, USPS submitted a letter to Debra Sherwood and Drew Backstrand, the Executive Director and Secretary of CAM, respectively, setting forth the agreed terms of sale. (*See* Fagan Aff. ¶ 13; Lackey Decl. [Doc. # 33].)

On July 27, 2012, CAM submitted to USPS a signed Agreement of Purchase and Sale, a lease agreement so that USPS could continue to occupy the Atlantic Street Station until it found a suitable replacement, and an escrow agreement. (*See* Fagan Aff. ¶ 14.) Four days later, Sherwood emailed USPS and C&W, seeking an additional six months to

---

[3] At the time, CAM was known as Debra Sherwood – Lower Fairfield Arts Center.

raise development money and a $200,000 reduction in the purchase price to cover the removal of asbestos and paint.  (*See* Fagan Aff. ¶ 16 & Ex. E.)  On August 2, 2012, CAM submitted a new offer that USPS considered to be considerably less appealing and the parties resumed negotiations with CAM submitting a second offer on September 4, 2012. (*See* Fagan Aff. ¶ 17–18 & Ex. G.)  CAM was required to submit a $500,000 deposit on the date the offer was submitted.  (Fagan Aff. ¶ 21 & Ex. G.)  On September 13, 2012, CAM requested an additional five days to submit the deposit, but never did so.  (Fagan Aff. ¶ 22 & Ex. H; Backstrand Depo. at 145–46.)

After CAM's failure to submit the deposit, USPS entered into negotiations with the next highest bidder, Cappelli.  (Fagan Aff. ¶ 24.)  On December 21, 2012, Cappelli submitted a signed purchase and sale agreement to purchase the property for $4,300,000, along with an initial deposit of $100,000. (*Id.* ¶ 27; *see also* Agreement of Purchase and Sale, Lackey Decl. Ex. 1 [Doc. # 33-1].)  USPS accepted this offer on December 27, 2012. (Fagan Aff. ¶¶ 24.)  Under the terms of the agreement, USPS was permitted to delay the closing by up to two years while it sought a site for a new post office in Stamford.[4]  The transaction was scheduled to close on September 25, 2013, but did not as a result of this

---

[4] An amendment to the agreement provided that closing would occur on September 25, 2013.  (*See* 1st Amendment, Lackey Decl. Ex. 1.)  Under the original agreement, USPS would be in default if it could not deliver the property by the closing date.  (*See* Purchase and Sale Agreement § 1.3.)  In the event of a default by USPS, it would be required to return the deposit to Cappelli if it could not cure the default in thirty days but Cappelli was not entitled to damages.  (*Id.* § 6.9.2.)

lawsuit.[5]  Plaintiffs contend that Cappelli "plans to demolish a substantial part" of the Atlantic Street Station and erect two twenty-story luxury apartment buildings, which will result in the public losing access the art and architectural features of the Atlantic Street Station.  (Am. Compl. ¶ 62.)

> 3.   *The Environmental Review Process*

Before USPS entered into negotiations with CAM and Cappelli in 2012 to sell the Atlantic Street Station, it had engaged in several unsuccessful attempts to redevelop or dispose of the property.  (Rouse Aff. ¶¶ 6–8; Fagan Aff. ¶ 3.)  During such an attempt in 2010, USPS conducted a review of the potential effects that a sale could have on the environment and the historic property.  (Parrish Decl. [Doc. # 34] ¶ 5.)  In July 2010, USPS hired an environmental consultant, Apex Companies, LLC ("Apex"), to complete an environmental disposal due diligence report.  (*See* Parrish Aff. Ex. B (the "Apex Report").)  The stated objective of the Apex Report "was to determine whether conditions are present at the Site, which may pose a risk of potential environmental liability."  (*Id.* at 1.)  The Apex Report also included an analysis of USPS's obligations under NEPA.  (*See* Parrish Decl. ¶ 4.)  Dale Cross, an Environmental Scientist with Apex, completed a USPS standard checkbox form titled a "Facilities Environmental Checklist," which addressed a number of potential environmental effects of a sale.  (*See* Parrish Decl. Ex. A.)  In the notes section of the form, Cross wrote that there were three potential issues with a sale of the property: (1) that the site was located in a Coastal Zone Management Area; (2) it was

---

[5]  Plaintiffs also filed a related notice of lis pendens with the Stamford Land Records, which the Court discharged on October 28, 2013 upon USPS's application.  (*See* Ruling and Order on Application for Discharge of Notice of Lis Pendens [Doc. # 53].)

within a half mile of a Superfund site, and (3) that the property was listed on state and federal registers of historic places.  (*Id.* at 2.)

Two questions on the form related to the NEPA claims now at issue in this action. One question asked whether the proposed action was "categorically excluded" from review under NEPA.[6]  Cross checked "yes," and the form did not require him to specify which of the multitude of exclusions listed in USPS's regulations at 39 C.F.R. § 775.6 applied.  (*Id.*)  Second, Cross indicated that there were no "extraordinary circumstances" to make a categorical exclusion inapplicable.

### 4.  *Historic Review*

During previous attempts to develop the Atlantic Street Station in 1997 and 2007, USPS undertook to consider the effect on the historical attributes of the property.  (*See generally* Rouse Aff.)  In 1997, USPS contemplated maintaining its retail operations in the original portion of the Atlantic Street Station constructed in 1916 while freeing up additional space for outside commercial retail tenants and the construction of a new building at the location of the 1939 structure.  Pursuant to its obligations under NHPA, discussed *infra*, USPS entered into a Memorandum of Agreement (the "MOA") with Connecticut's State Historic Preservation Officer ("SHPO").  (*See* MOA, Rouse Aff. Ex. 3.)  SHPO had determined that the proposed development would constitute an "adverse effect on the cultural resource" under NHPA, but concluded that "no feasible and prudent alternative exists to accomplish USPS's objectives for this property."  (Letter

---

[6] *See* NEPA discussion section *infra*.  Briefly, under NEPA, agency actions require the completion of an environmental impact statement or an environmental assessment unless such actions fall within categories of actions that an agency has determined do not "have a significant impact" on the environment.

from Dawm Maddox to Cece Saunders, Rouse Aff. Ex. 2 at 1.)  Accordingly, SHPO did "not object to the overall concept of this undertaking" and expressed support for restoring the 1916 portion of the property.  (*Id.*)  It did object to plans to remove the balustrades and exterior stairs as inconsistent with "preservation goals" and expressed "serious reservations" about the proposed removal of the northern wall of the 1916 building to connect it with a newly constructed structure.  (*Id.*)

Under the MOA, USPS agreed to submit more detailed evaluations of the need to construct a new development along the perimeter walls of the original 1916 structure, remove the entrance balustrades, and to explain its plans to restore the original lobby and convert it into a combination USPS and commercial retail facility.  (MOA at 1–2.)  USPS agreed that any sale or lease of the Atlantic Street Station would contain a binding Preservation Covenant to ensure that the original 1916 structure would be "retained, restored, and maintained in accordance with plans approved in writing by SHPO."  (*Id.* at 3.)

In 2007, pursuant to new development plans with a different developer, the 1916 structure was envisioned to house a restaurant, and SHPO affirmed that the MOA applied to these revised plans.  (*See* 1st Am. to MOA, Rouse Aff. Ex. 4 at 1.)  When USPS again undertook to sell the Atlantic Street Station, on April 12, 2011, USPS sent a draft of the Preservation Covenant envisioned by the original MOA to SHPO that precluded all future developers from making "exterior construction, alteration, or rehabilitation" affecting "the historic features of the property" without SHPO's express permission but permitted the demolition of the 1939 addition.  (*See* Rouse Aff. ¶¶ 9–10 & Ex. 5 ¶ 2.)  SHPO returned a copy of this letter to USPS on June 22, 2011 with a stamp marked

"CONCUR" on the first page, indicating SHPO's consent to the development plans with the inclusion of the Preservation Covenant. (Rouse Aff. ¶ 12 & Ex. 6.) This Preservation Covenant was included in the contract with Cappelli. (Harper Decl. Ex. 1 [Doc. # 32-1] at 6.)

               5.     *The Commencement of this Action*

Plaintiffs assert five causes of action. First, that USPS failed to conduct an Environmental Assessment or to prepare an Environmental Impact Statement as mandated by the NEPA. (Am. Compl. ¶¶ 44–54.) Second, USPS failed to consider the effects of the sale of the Atlantic Street Station on the historic building in violation of NHPA. (*Id.* ¶ 68.) Third, that under the public trust doctrine, which can "prevent the government from alienating the public right to access navigable waters and natural resources," USPS "should not be allowed to transfer or alienate" the Atlantic Street Station and other "publicly funded treasures in quick sales to commercial interests without preserving and protecting the public's interest in them." (*Id.* ¶ 70–77.) Fourth, that in "selling to the low bidder on preferential terms" rather than to CAM, USPS violated 39 U.S.C. § 403(c), which prohibits USPS from showing "any undue or unreasonable discrimination among users of the mails."[7] (*Id.* ¶ 87.) And fifth, that USPS failed to comply with 39 U.S.C. § 404(d), governing the closure of post offices, which requires USPS to consider, among other factors, the "effect of a closing or consolidation on the community." (*Id.* ¶¶ 88–104.)

---

[7] In discharging CAM's notice of lis pendens related to this count, the Court concluded that it lacked subject matter jurisdiction under § 403(c) to adjudicate this claim. (*See* Ruling and Order on Application for Discharge of Notice of Lis Pendens [Doc. # 53] at 7.)

Plaintiffs seek an injunction enjoining "USPS from awarding a contract for the sale of, demolition of, or construction on this federal property" until it complies with its obligations under NEPA and NHPA. (*Id.* ¶¶ 65, 69.)

**B.      Procedural History**

Under the terms of the TRO issued on September 26, 2013, Defendants were enjoined "from, directly or [in]directly, transferring or otherwise alienating any of Defendant's title or interest in and to the Stamford Post Office to any person or entity whosoever pending a hearing and ruling on the Plaintiff's application for a preliminary injunction or further order of the court." (Order Granting Pls.' Ex Parte Application for TRO [Doc. # 13] at 6.)

Defendants averred during the TRO hearing that if the sale did not occur as scheduled on September 25, 2013, there was a substantial risk that the buyer would not purchase the property even if Defendants prevailed. (*Id.*) Accordingly, Plaintiffs were ordered to post a bond of $4.5 million by October 3, 2013 to pay costs and damages sustained by USPS should it be found to have been wrongfully enjoined. (*Id.* at 7; Endorsement Order [Doc. # 18] ¶ 1.) Plaintiffs reported that they were unable to raise this sum of money, and accordingly, by its own terms, the TRO expired on October 3, 2013. (*See* Pls.' Notice Regarding Bond [Doc. # 19] at 1; Endorsement Order ¶ 1.)

**II.    Discussion**

**A.      Standing**

USPS has not contested Plaintiffs' standing to bring this suit, although it noted as an aside that Plaintiffs' asserted failure to demonstrate irreparable harm justifying the issuance of a preliminary injunction, "raises serious concerns about their standing to

bring" claims under NEPA and NHPA.  (Defs.' Opp'n to Prelim. Inj.  [Doc. # 28] at 12 n.2.).  Plaintiffs have also devoted little attention to the issue of standing, simply asserting that they have standing "as interested parties and members of the local community who have been or will be adversely affected by the Defendants' actions" and "via the doctrine of associational standing because they represent members of the local community who have been or will be adversely affected by the Defendants' actions."  (Am. Compl. ¶ 9.)

The Supreme Court has "established that the irreducible constitutional minimum of standing contains three elements."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  A "party must demonstrate that (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.  The 'injury in fact' requirement has been characterized as 'an invasion of a legally protected interest.'  The party seeking judicial review bears the burden of alleging facts that demonstrate its standing." *Green Island Power Auth. v. F.E.R.C.*, 577 F.3d 148, 159 (2d Cir. 2009) (internal quotation marks, citations, and alterations omitted).  "A plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future." *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998)

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice" to satisfy a plaintiff's burden "for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561 (quoting *Lujan v. National*

*Wildlife Federation,* 497 U.S. 871, 889 (1990)) (alterations in original).  "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton,* 405 U.S. 727, 735 (1972)).

"It is well settled that, in a NEPA suit, 'a cognizable procedural injury exists when a plaintiff alleges that a proper [environmental impact statement] has not been prepared . . . when the plaintiff also alleges a concrete interest—such as an aesthetic or recreational interest—that is threatened by the proposed actions.'" *Ouachita Watch League v. Jacobs,* 463 F.3d 1163, 1171 (11th Cir. 2006) (quoting *Sierra Club v. Johnson,* 436 F.3d 1269, 1277 (11th Cir. 2006)).

"An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. at 181. "So long as one party has standing, other parties may remain in the suit without a standing injury." *Ouachita Watch League,* 463 F.3d at 1170 (citing *Clinton v. City of New York,* 524 U.S. 417, 434–36 (1998)).

### B.     Standard for Issuance of a Preliminary Injunction

"[A] preliminary injunction is an extraordinary remedy that should not be granted as a routine matter." *JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75, 80 (2d Cir. 1990).  "A plaintiff seeking a preliminary injunction must establish [1] that he is

likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *New York Progress & Prot. PAC v. Walsh*, -- F.3d --, No. 13-cv-3889, 2013 WL 5746142, at *2 (2d Cir. Oct. 24, 2013) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

### C.     Likelihood of Success on the Merits[8]

Because NEPA and NHPA do not provide private rights of action, courts review agency actions under the Administrative Procedures Act (the "APA").  *Brodsky v. U.S. Nuclear Regulatory Comm'n*, 704 F.3d 113, 119 (2d Cir. 2013) ("Because NEPA does not itself provide for judicial review, the APA controls."); *Karst Envtl. Educ. & Prot., Inc. v. E.P.A.*, 475 F.3d 1291, 1295 (D.C. Cir. 2007) ("NHPA actions must also be brought pursuant to the APA.").

Under the APA, courts review contested agency actions to determine if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  An agency's actions are arbitrary and capricious if it has "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle Mfrs. Assn. of*

---

[8] Because the Court concludes that Plaintiffs have established a likelihood of success on the merits of their NEPA claim, the Court will only address this claim and the closely-related NHPA claim.

*United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 43 (1983)).

"Although highly deferential, this standard 'does not equate to no review.'" *Brodsky*, 704

F.3d at 119 (quoting *Wilson v. CIA,* 586 F.3d 171, 185 (2d Cir. 2009)).

     *1.*    *NHPA*

     NHPA "has a fairly broad mandate, in keeping with the longstanding

Congressional interest in historic preservation" and "'requires each federal agency to take

responsibility for the impact that its activities may have upon historic resources, and

establishes the Advisory Council on Historic Preservation . . . to administer the Act.'"

*Bus. & Residents Alliance of E. Harlem v. Jackson*, 430 F.3d 584, 590 (2d Cir. 2005)

(quoting *Nat'l Mining Ass'n v. Fowler,* 324 F.3d 752, 755 (D.C. Cir. 2003)) (alterations in

original).

     Section 106 of NHPA requires that federal agencies[9] "take into account the effect

of [any] undertaking on any district, site, building, structure, or object that is included in

or eligible for inclusion in the National Register [of Historic Places]." 16 U.S.C. § 470f.

"Section 106 is therefore primarily procedural in nature.  It does not itself require a

particular outcome, but rather ensures that the relevant federal agency will, before

approving funds or granting a license to the undertaking at issue, consider the potential

impact of that undertaking on surrounding historic places.  As such, courts have

sometimes referred to Section 106 as a 'stop, look, and listen' provision."  *Jackson*, 430

---

[9] USPS "does not believe that Congress intended" NHPA to apply to its "disposition of real property," but it "does not advance at this time" an argument that it is exempt from the statute.  (Defs.' Mem. in Opp'n to Prelim. Inj. at 13–14.)  Instead, USPS had adopted on a "voluntary basis," policies to comply with NHPA.  *See* 39 C.F.R. § 241.4(d).

F.3d at 591 (internal citation omitted).  If the undertaking in question "is a type of activity that does not have the potential to cause effects on historic properties," an agency "has no further obligations under Section 106."  36 C.F.R. § 800.3(a)(1).

The regulations implementing the NHPA require agencies "to consult with state historic preservation officers ('SHPOs'), make reasonable and good faith efforts to identify historic properties, determine their eligibility for listing in the National Register of Historic Places, and assess the effects of a project on such properties."  *Pres. Coal. of Erie Cnty. v. Fed. Transit Admin.*, 356 F.3d 444, 447 (2d Cir. 2004).  An adverse effect exists when "an undertaking may alter, directly or indirectly, any of the characteristics of a historic property . . . in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association."  36 C.F.R. § 800.5(a)(1).  The agency is required to notify and solicit comment from the Advisory Council on Historic Preservation, *see* 16 U.S.C. § 470f, and consult with the appropriate SHPO "to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties."  36 C.F.R. § 800.6(a).

USPS contends that "the only undertaking" at issue here is "USPS's transfer of title," which "does not alter the historical attributes of the Atlantic Street Station," because "nothing about the transfer of title changes the architecture of the building."  (Defs.' Opp'n to Prelim. Inj.  at 20.)  Accordingly, it argues that such an undertaking is not covered by NHPA and it had no obligations under the act.  (*Id.* (citing 36 C.F.R. § 800.3(a)(1)).)  Defendants further argue that even if Section 106 applies, they fulfilled their obligations by reasonably concluding, with the concurrence of SHPO, that the

disposal of the property with the Preservation Covenant would result in no adverse effect. (Defs.' Opp'n to Prelim. Inj. at 21.)

Plaintiffs initially contended that they "believe[d]" that USPS failed "to document the impact of selling" the Atlantic Street Station "in clear violation of" NHPA. (Pls.' Ex Parte Application for TRO ¶ 52.) In light of Defendants' showing of their efforts to comply with NHPA and protect the property with the Preservation Covenant, Plaintiffs now contend only that they "have a lawful right . . . to present other alternatives which may better protect the historic property, and to have those alternatives meaningfully considered." (Pls.' Mem. Supp. Prelim. Inj. [Doc. # 41] at 3.)

In accordance with its obligations under NHPA, USPS consulted with SHPO and obtained its concurrence that the inclusion of the Preservation Covenant would result in "no[] adverse impact on the historic nature of the building." (Rouse Aff. Ex. 6 at 2.) When a SHPO agrees that an undertaking would have "no effect," then an agency's obligations under Section 106 are fulfilled. *See* 36 C.F.R. § 800.4(d)(1)(i). USPS's determination that the Preservation Covenant would result in "no effect" seems at odd with SHPO's determination in 1997 that the proposed development would constitute an "adverse effect," but there was "no feasible and prudent alternative . . . to accomplish USPS's objectives for this property." (Letter from Dawm Maddox to Cece Saunders at 1.),

Rather, the record appears more likely to support the conclusion that the sale of the property would result in an adverse effect but the Preservation Covenant would *minimize or mitigate* it, not eliminate it. The resolution of adverse effects would require additional procedural steps aside from consultation with SHPO, such as notification to the Council on Historic Preservation and the solicitation of public comment, that are not

18

reflected in the record thus far.  *See* 36 C.F.R. § 800.6.  Ultimately, however, NHPA only requires that USPS take steps to minimize the impact on the structure, which is what it did with the Preservation Covenant.  Given, however, the deferential standard of review owed to the agency, Plaintiffs are not likely to prevail on the merits of NPHA claim, and furthermore this deviation from NHPA may not justify preliminary injunctive relief.  *See Bonnichsen v. United States*, 217 F. Supp. 2d 1116, 1164 (D. Or. 2002) ("[The agency] violated the NHPA requirements that the views of 'interested parties' be considered, that potential loss of archaeological data be mitigated, and that the potentially negative effects of the project be fully and carefully considered. Though the Court will declare that NHPA was violated, no relief other than this declaration is appropriate at this time.").

      2.    *NEPA*

NEPA was enacted to "declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.  NEPA requires federal agencies, including USPS,[10] to review the environmental impact of major federal actions significantly affecting the quality of the human environment.  42 U.S.C. § 4332(2)(C).

---

[10] In order to allow USPS to operate its affairs in a "businesslike way," Congress provided in 1970 that "no Federal law[s] dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds" apply to the USPS.  39 U.S.C. § 410(a).  Despite this law, the Second Circuit determined that Congress saw NEPA as "unusually important" and intended for it to apply broadly even to USPS, which "does furnish an essential public service and has public functions and responsibilities."  *Chelsea Neighborhood Ass'ns v. U.S. Postal Serv.*, 516 F.2d 378, 383–86 (2d Cir. 1975).

The Supreme Court has stated that NEPA has twin aims.  "First it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action.  Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision making process."  *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council*, 462 U.S. 87, 97 (1983) (internal citations and quotation marks omitted).

"The required environmental impact statement must address any adverse unavoidable environmental effects resulting from the implementation, alternatives to the proposed action, the relationship between short-term uses and the long-term maintenance of the environment, and any irretrievable commitments of resources involved in the proposed action."  *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 12–13 (2d Cir. 1997) (citing 42 § 4332(2)(C)).  This detailed statement "insures the integrity of the agency process by forcing it to face those stubborn, difficult-to-answer objections without ignoring them or sweeping them under the rug" and serves as an "environmental full disclosure law so that the public can weigh a project's benefits against its environmental costs." *Sierra Club v. United States Army Corps of Eng'rs*, 772 F.2d 1043, 1049 (2d Cir. 1985).

Under NEPA, an agency contemplating "major Federal actions significantly affecting the quality of the human environment" must prepare an Environmental Impact Statement ("EIS").  42 U.S.C. § 4332(2)(c).  The EIS demonstrates the agency's "consideration of the reasonably foreseeable environmental effects" of the contemplated action. *Brodsky*, 704 F.3d at 119.

In order to reduce the administrative burden on agencies from NEPA, implementing regulations encourage agencies to develop "categorical exclusions" or categories of actions that do not individually or cumulatively have a significant effect on the environment, and therefore do not require an EIS absent "extraordinary circumstances." *See* 40 CRF § 1500.4(p); *see also Fund for Animals v. Babbitt,* 89 F.3d 128, 130 (2d Cir. 1996) (noting that "[t]he [Counsel on Environmental Quality] has authorized the use of categorical exclusions to promote efficiency in the NEPA review process").

If an agency's action is neither categorically excluded from nor clearly subject to the requirements of producing an EIS, an agency may prepare "a more limited document, an Environmental Assessment (EA)." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004). "The EA is a 'concise public document' that '[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].'" *Id.* (quoting 40 C.F.R. § 1508.9(a)). "If, pursuant to the EA, an agency determines that an EIS is not required under applicable CEQ regulations, it must issue a 'finding of no significant impact' (FONSI), which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment." *Id.* at 758–59 (citing 40 C.F.R. §§ 1501.4(e), 1508.13). If an agency action is not subject to a categorical exclusion, "any doubt as to whether contemplated action requires an EIS must be resolved by preparing an EA." *Brodsky*, 704 F.3d at 120.

Because "NEPA is, at its core, a procedural statute that mandates a process rather than a particular result," a court's review "focuses primarily on the procedural regularity of the decision, rather than on its substance." *Id.* at 118–19 (internal quotation marks

omitted).  "The only role for a reviewing court is to insure that the agency has taken a hard look at environmental consequences; it cannot interject itself within the area of discretion of the executive as to the choice of the action to be taken."  *Coal. on W. Valley Nuclear Wastes v. Chu*, 592 F.3d 306, 310 (2d Cir. 2009) (quoting *Sierra Club v. U.S. Army Corps of Eng'rs,* 701 F.2d 1011, 1029 (2d Cir. 1983)) (alterations and internal quotation marks omitted).

USPS has adopted a categorical exclusion that exempts from the environmental review process, the

> [a]cquisition and disposal through sale, lease, transfer or exchange of real property that does not involve an increase in volumes, concentrations, or discharge rates of wastes, air emissions, or water effluents, and that under reasonably foreseeable uses, have generally similar environmental impacts as compared to those before the acquisition or disposal.

39 C.F.R. § 775.6(e)(8).

Defendants contend that this categorical exclusion "applies on its face" to the Cappelli sale, and USPS concluded that the reasonably foreseeable post-transfer use of the property "would have the same general environmental impacts as it had during its operations as a USPS facility."  (Defs.' Opp'n to Prelim. Inj. at 17–18.)  Plaintiffs contend that the NEPA categorical exclusion is inapplicable, because USPS failed to "evaluate the impact of a prospective change in use from a post office to a high-rise apartment building."  (Pls.' Mem. Supp. Prelim. Inj. at 3–4.)  They note that the Apex Report was completed in 2010 during a different attempt by USPS to sell the property and before the Cappelli sale was contemplated.  (*Id.* at 4.)  Further, the Apex Report had the stated objective of determining the "potential environmental liability" of conditions at the site

and did not consider "the historic or environmental impact of Cappelli's plans to develop the site, tearing down at least a portion of the building, building a high-rise apartment building, and limiting the public's access to the property paid for by the public." *Id.*

At oral argument, USPS maintained that the deference owed to USPS's application of its categorical exclusions justified affirming the agency's decision and that Plaintiffs had shown only that they disagreed with this decision and not that it was arbitrary and capricious. Recognizing that the Court's review of USPS's decision to apply the categorical exclusion here is under a "highly deferential" standard, it is nonetheless a review, *Brodsky*, 704 F.3d at 119, and the Court need not defer to an agency's decision where it has "entirely failed to consider an important aspect of the problem" or its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *Nat'l Ass'n of Home Builders*, 551 U.S. at 658; *see also Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1468 n.5 (9th Cir. 1996) ("An agency satisfies NEPA if it applies its categorical exclusions and determines that neither an EA nor an EIS is required, so long as the application of the exclusions to the facts of the particular action is not arbitrary and capricious.").

Even under this deferential standard of review, USPS's application of the categorical exclusion cannot be squared with common sense.  First, contrary to the assertions of USPS, the categorical exclusion appears to be *inapplicable* on "its face."  By its own terms 39 C.F.R. § 775.6(e)(8) only exempts from environmental review the sale of property "that does not involve an increase in volumes, concentrations, or discharge rates of wastes, air emissions, or water effluents, and that under reasonably foreseeable uses, have generally similar environmental impacts as compared to those before the acquisition or disposal."  It strains logic to understand how the construction of two high-rise residential apartment buildings would "have generally similar environmental impacts" as the day-to-day use of the property as an already-constructed post-office.  Similarly, it would appear that the construction and use of the property as two residential towers, would likely result in an increase of "wastes, air emissions, or water effluents."

Charlotte Parrish, a Facilities Environmental Specialist for USPS, was responsible for oversight of the Apex review, and concurred with Cross's determination that a categorical exclusion applied.[11]  (Parrish Decl. ¶¶ 1, 5–6.)  In a declaration completed for this case, Parrish wrote that she continues to believe that the categorical exclusion at 39 C.F.R. § 775.6(e)(8) applies to the current plans for disposal of the Atlantic Street Station

---

[11]  After determining that the disposal of the Atlantic Street Station was categorically excluded from review, USPS's regulations required it to complete a Record of Environmental Consideration.  (Parrish Decl. ¶ 11.)  Parrish wrote that in September 2010, she emailed David Rouse, a USPS asset manager, with "environmental guidance on Apex's work and informing him of my assumption that he would be completing" the required documentation.  (*Id.*)  Parrish was unsure if he ever completed the Record of Environmental Consideration, and "[t]o ensure the administrative record is complete," she completed one on September 24, 2013.  (*Id.* ¶ 12 & Ex. D.)

and "[t]he potential use of the Property as condominium units does not change my conclusion." (Parrish Decl. ¶ 10.) Parrish continued:

> Based on my experience overseeing over one hundred property disposals, the intended use of this Property following disposal will have the same general environmental impacts as the Property has had during the Property's operations as a USPS facility. Because the Postal Service is a federal entity, when the Property is purchased by a non-governmental buyer, it would likely be subject to collectively even more environmental protection, historical preservation, and land use laws than the Property is currently subject to under USPS's ownership.

(*Id.*)

While NEPA primarily seeks to vindicate procedural concerns and does not mandate any specific result, the record before the Court indicates that USPS's procedural compliance was deficient. Notably, the Apex Report, which USPS contends demonstrates that it reasonably concluded that the categorical exclusion applied, was completed in 2010 under a different development scheme. The record does not clarify what post-transfer use was intended for the property in 2010 or whether earlier contemplated development plans were on the same scale as the Cappelli plan. Thus, there is no basis for concluding that the 2010 review adequately considered the extensive plans for development contemplated by Cappelli.

At oral argument, USPS was unable to point to any evidence in the record showing that USPS specifically considered Cappelli's plans to develop two high-rise residential apartment buildings at the site. The only evidence of USPS's consideration of the categorical exclusion was a simple unelaborated "yes" response on a checkbox form completed over two years prior to the contemplated action, which demonstrates scant

consideration of the applicability of NEPA.[12]  *See United States v. Coal. for Buzzards Bay*, 644 F.3d 26, 35 (1st Cir. 2011) ("Careful perscrutation of the record in this case persuades us that the Coast Guard's bareboned negative response—a simple 'no'—to the prompt asking whether the proposed action was [exempted by a categorical exclusion] was arbitrary and capricious.").

Accordingly, USPS's bald and seemingly illogical assertion that "the intended use of this Property following disposal will have the same general environmental impacts as the Property has had during the Property's operations as a USPS facility" was completely unsupported by any evidence before the agency and implausible, and thus, arbitrary and capricious.  *See Nat'l Ass'n of Home* Builders, 551 U.S. at 658; *see also California v. Norton*, 311 F.3d 1162, 1176 (9th Cir. 2002) ("It is difficult for a reviewing court to determine if the application of an exclusion is arbitrary and capricious where there is no contemporaneous documentation to show that the agency considered the environmental consequences of its action and decided to apply a categorical exclusion to the facts of a particular decision.").

USPS further contends that the only action that it had to consider under NEPA was "the transfer of title, not property redevelopment" and that it would be "unreasonable" for the Court to require it to obtain and consider the specific

---

[12] While USPS's regulations provide that an "environmental checklist may be used to support a record of environmental consideration" in making "the determination that the proposed action does not require an environmental assessment," 39 C.F.R. § 775.9, the checklist here was not prepared in relation to this particular attempt by USPS to sell the property.  Further, even if the applicability of the categorical exclusion had been properly documented here, because the categorical exclusion was inapplicable on its face, the decision to invoke it was arbitrary and capricious.

development plans of the buyer.  (Reply [Doc. # 43] at 4–5.)   This argument fails for two reasons.  First, it is contradicted by the plain language of the categorical exclusion, which requires USPS to consider "reasonably foreseeable" post-transfer uses in a sale that will necessarily involve a party other than USPS developing the property.[13]   39 C.F.R. § 775.6(e)(8).

Second, the case cited in support of this proposition undermines USPS's ultimate position.  In *Conservation Law Found. of New England, Inc. v. General Services Administration*, 707 F.2d 626, 631 (1st Cir. 1983), there was no dispute that the disposal of 3200 acres of surplus federal property was a major federal action that required the preparation of an EIS; the only dispute was whether this EIS was sufficiently detailed.  The logic of the court's ruling, however, is instructive here.  The First Circuit affirmed a district court ruling requiring the General Services Administration (the "GSA") to consider the "probable reuses" of property it intended to sell to a private developer for residential development.  *Id.* at 632.  The court stated that the GSA's argument that EIS consideration of the private developer's intended use of the property was not required because it would be similar to the current use, "assume[d] what can only be demonstrated by reasoned analysis."  *Id.* at 633.  In requiring the GSA to analyze the probable post-transfer use of the property, the First Circuit did not "envisage a major or time-consuming undertaking on the part of the agency."  *Id.*

---

[13] Where the reasonably foreseeable post-transfer uses are not similar, USPS's own regulations require the preparation of an EA.  *See* 39 C.F.R. § 775.5(b)(10) (requiring an EA for "[r]eal property disposal involving a known change in use to a greater environmental intensity.").

27

Although the analysis would inherently contain some speculation regarding the intended use by a third party and "cannot be exhaustive," it must "articulate a rationale for its assumptions about the probable reuses of the parcels remaining in the lawsuit and then specify the environmental effects of such probable reuses with particular attention to those with the most significant adverse environmental effects." *Id.* at 634. As USPS noted in its briefing, the First Circuit reversed the portion of the district court's ruling requiring the GSA to obtain and analyze the specific plans of the developer and potentially prepare a supplemental EIS based on their contends. *Id.* at 636.

A district court in this circuit concluded that the Forrest Service's decision to apply a categorical exclusion was "arbitrary and capricious" under circumstances similar to the case at bar. *RESTORE: The N. Woods v. U.S. Dep't of Agric.*, 968 F. Supp. 168, 176 (D. Vt. 1997). In *RESTORE,* the Forrest Service transferred a fifty-seven acre parcel of land consisting of an unpaved parking lot, tennis courts, and woods to a developer who intended to build a hotel/conference center and a paved parking lot on the property. *Id.* at 169–170. The agency did not conduct any environmental review, asserting that a categorical exclusion for the sale or exchange of land "where resulting land uses remain essentially the same" applied. *Id.* at 176. Because the agency gave "no explanation or analysis whatsoever as to why it considered the present and proposed land uses to be essentially the same" and there was not "any rational basis for concluding that a hotel/conference center is the same land use as a parking lot and tennis courts," it enjoined the agency to comply with NEPA because the categorical exclusion did not apply. *Id.* at 177.

28

Because USPS's application of the categorical exclusion to the Cappelli sale and conclusion that the construction of two residential towers would have "generally similar environmental impacts" to the operation at that site of a historic post office appears to be "so implausible that it could not be . . . the product of agency expertise," *Nat'l Ass'n of Home Builders*, 551 U.S. at 658 (internal quotation marks omitted), Plaintiffs have demonstrated that they are likely to succeed on the merits of their NEPA claim.

### D.      Irreparable Harm

Given Plaintiffs' likelihood of success on the merits of their NEPA claim, the other requirements for obtaining a preliminary injunction will be analyzed with reference to this claim.

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Bisnews AFE (Thailand) Ltd. v. Aspen Research Group, Ltd.,* 437 F. App'x 57, 58 (2d Cir. 2011). Traditionally, some courts have assumed that "[i]n mandating compliance with NEPA's procedural requirements as a means of safeguarding against environmental harms, Congress has presumptively determined that the failure to comply with NEPA has detrimental consequences for the environment." *Davis v. Mineta*, 302 F.3d 1104, 1114–15 (10th Cir. 2002). As a result, these courts have held "that harm to the environment may be presumed when an agency fails to comply with the required NEPA procedure." *Id.* Recently, however, the Supreme Court has made clear that courts should not "presume that an injunction is the proper remedy for a NEPA violation." *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2757 (2010). Instead, movants must satisfy all of the four requirements for injunctive relief, including demonstrating specific irreparable injury.

Plaintiffs assert that in the absence of a preliminary injunction they will suffer irreparable harm in two ways.  First, "the destruction of property" that will result from the sale to Cappelli, "who intend[s] to demolish at least part of the structure."  (Pls.' Ex Parte Application for TRO ¶ 48.)  Second, the "loss of title to real estate" that would result from the sale of the property to Cappelli, a non-governmental entity, NEPA's requirements would no longer apply.  (*Id.*)  USPS contends that the Preservation Convent included in the contract with Cappelli precludes the first purported harm, and that Plaintiffs cannot assert that they will be harmed by losing title to a property that they do not hold or have legal right to.  (*See* Defs.' Opp'n to Prelim. Inj.  at 11; *see also* Preservation Covenant, Harper Decl. Ex. 1 ¶¶ 1, 2.)

While irreparable harm cannot be presumed from a NEPA procedural violation and "plaintiffs [are] still required to show irreparable harm to themselves under NEPA," they can "do so by showing injury to their specific environmental interests."  *Sierra Club v. U.S. Army Corps of Engineers*, 645 F.3d 978, 995 (8th Cir. 2011) (internal quotation marks omitted).  As the Supreme Court has recognized, a concrete "[e]nvironmental injury," rather than just a NEPA procedural violation, "by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable.  If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment."  *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 545 (1987).  Accordingly, courts have found irreparable harm and granted preliminary injunctions to prevent a wide array of environmental injuries, including those resulting from construction and development.  *See, e.g.*, *New York v. Shinnecock Indian Nation*, 523 F. Supp. 2d 185, 301 (E.D.N.Y. 2007)

("[P]laintiffs have shown that construction and operation of a casino in violation of the zoning laws would irreparably harm the community in terms of its essential character, as well as its health and safety."); *Concerned Citizens of Chappaqua v. U.S. Dep't of Transp.*, 579 F. Supp. 2d 427, 432 (S.D.N.Y. 2008) ("The Court agrees that the imminent felling of 61 trees constitutes irreparable harm."); *United States v. 27.09 Acres of Land, More or Less, Situated in Town of Harrison & Town of N. Castle, Cnty. of Westchester, State of N.Y.*, 760 F. Supp. 345, 354 (S.D.N.Y. 1991) ("[T]he movants have shown a real danger that they will suffer irreparable harm absent an immediate injunction.  Construction is likely to begin promptly if injunctive relief is not granted.  Once begun, such work cannot be undone.  That work may well result in actual environmental harm, which similarly cannot be undone."); *Fund For Animals v. Clark*, 27 F. Supp. 2d 8, 14 (D.D.C. 1998) ("[T]the combination of the injury suffered by plaintiffs due to federal defendants' procedural failure to comply with NEPA and the aesthetic injury the individual plaintiffs would suffer from seeing or contemplating the bison being killed in an organized hunt leads the court to conclude that the plaintiffs have carried their burden of demonstrating the presence of an irreparable harm should the court not grant injunctive relief.")

Although Plaintiffs have devoted little attention to the need to establish irreparable harm in their briefing and have not specified how the development of the Atlantic Street Station is specifically an environmental rather than a historical-protection or economic harm, the Amended Complaint identifies the potential "permanent" loss of the "community space created by the public post office in such a unique, beautiful and

architecturally significant building" that will be caused by demolishing part of the Atlantic Street Station and constructing high-rise luxury housing.[14]  (Am. Compl. ¶ 62.)

At oral argument, USPS conceded that Plaintiffs can also rely on evidence in the record submitted by Defendants to establish irreparable harm.  While the injuries cited by Plaintiffs are not classic environmental harms, undoubtedly NEPA includes the "protection of the quality of life for city residents," including "[n]oise, traffic, overburdened mass transportation systems, crime, [and] congestion," *Hanly v. Mitchell*, 460 F.2d 640, 647 (2d Cir. 1972), and those effects that are "aesthetic, historic, cultural, economic, [and] social."  40 C.F.R. § 1508.8; *cf. Friends of Ompompanoosuc v. F.E.R.C.*, 968 F.2d 1549, 1556 (2d Cir. 1992) (noting that agency "took the requisite 'hard look' at the environmental impact of the Project" and "the Project's impact on the aesthetic, cultural, historical, and recreational aspects of the site").

The environmental impacts that would result from even partial demolition of the Atlantic Street Station and the construction of a new development at the site are certainly

---

[14] At oral argument, Plaintiffs contended for the first time that the historical nature of the Atlantic Street Station constitutes "extraordinary circumstances," which under 39 C.F.R. § 775.6(a) precludes the application of a categorical exclusion.  USPS responded that the SHPO-approved Preservation Covenant took this sale out of the "extraordinary circumstances" exclusion.  While it appears that USPS's position has merit, *see Friends of Pioneer St. Bridge Corp. v. Fed. Highway Admin.*, 150 F. Supp. 2d 637, 653 (D. Vt. 2001) ("[A] mere finding of 'adverse effect' on a 4(f) property (especially where, as here, the agency has provided for mitigation of that adverse effect) is insufficient to support the conclusion that [under NEPA] the project will 'significantly impact' a 4(f) property." (footnote omitted)), the Court need not decide whether the "extraordinary circumstances" exception applies, because § 775.6(e)(8) does not apply on its face.  That is, the construction of two high-rise residential buildings on the site precludes the application of the categorical exclusion, by its own terms, even if the historic attributes of the Atlantic Street Station are substantially preserved.

irreparable in that they cannot be undone.  At oral argument, USPS argued that Plaintiffs had failed to establish that such harms are immediate, because construction is not imminent and Cappelli still needs to receive approval from the Stamford zoning authorities.  While Defendants are correct that Plaintiffs are not directly harmed by the loss of title to the Atlantic Street Station per se, it is clear that USPS intends to imminently pass title to Cappelli, and after doing so, NEPA will no longer apply.   Accordingly, the harm that Plaintiffs face regarding their NEPA claim is as immediate as it will ever get, and the issuance of a preliminary injunction is appropriate to preserve the relative position of the parties and the Court's ability to adjudicate the merits of Plaintiffs' NEPA claim.  *See Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 114 (2d Cir. 2006) ("A preliminary injunction . . . seeks generally only to maintain the status quo pending a trial on the merits.").  While perhaps, as Defendants contend, the Preservation Covenant and requirement that SHPO approve construction plans would minimize any environmental harm, this argument "assumes what can only be demonstrated by reasoned analysis" in an EIS or EA, as NEPA requires.  *Conservation Law Found. of New England, Inc.*, 707 F.2d at 631.[15]

---

[15] Defendants also contend that Plaintiffs have known about the disposal for at least a year since CAM's purchase offer failed and their "undue delay" precludes a finding of irreparable harm.  (Reply at 2.)  At oral argument, Plaintiffs asserted that although Cappelli contracted to purchase the property in December 2012, they were unaware of this fact until September 10, 2013, when it was first disclosed publically.  "Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights.  Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action."  *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985).  Here, however, despite Plaintiffs' delay, it cannot be doubted that the environmental harms at issue would be

E.        **Balance of the Equities and Public Interest**

In deciding whether to issue a preliminary injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.  In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24 (internal citations and quotation marks omitted).   USPS contends that it stands to suffer substantial harm if a preliminary injunction issues and it cannot complete the sale to Cappelli by October 31, 2013 when Cappelli's commitment from its lender expires.  These asserted harms include the loss of approximately $20,000 in administrative costs related to this transaction, potential costs in that amount to remarket the property, and further potential loses if a future buyer provides less favorable terms than Cappelli.  (Lackey Decl. ¶¶ 9, 11.)  Defendants note that behind Cappelli, the next two highest offers to purchase the property in 2012 were for $3,250,000 and $3,000,000, and that even future sale at those prices is not guaranteed, especially given recent reports of the poor conditions at the property.  (*See* Fagan Aff., Exs. A and B; Lackey Decl. ¶ 8.)

USPS contends that the public interest also militates in its favor, because "the purchaser intends to preserve, restore and renovate the building."   (Defs' Opp'n to Prelim. Inj. at 29.)  Additionally, USPS has no current ability to borrow money to finance its operations as it is currently borrowing the maximum amount available to it, and the

---

irreparable.  This delay may be more relevant to the balancing of the equities.  *See Nat'l Council of Arab Americans v. City of New York*, 331 F. Supp. 2d 258, 266 (S.D.N.Y. 2004) ("Plaintiffs' delay is one of the equities that argues strongly against granting a preliminary injunction.").

loss of the $4.3 million from this transaction reduces its funds for capital expenditures by that amount.  (Lackey Decl. ¶ 11(d).)

Plaintiffs have devoted little discussion to these factors, aside from noting the potential loss of public access to the Atlantic Street Station and the public interest in ensuring compliance with the laws.  Nevertheless, the Court finds that there is a strong public interest in ensuring that USPS complies with its NEPA obligations here and in any future sales of its other properties.  Moreover, any purported harms that it will suffer as a result of preliminary injunctive relief are of its own making in failing to comply with NEPA.

While there is no denying the serious financial crisis confronting the USPS, *see* Ron Nixon, *Postal Service Is Still Losing Money, but Not Quite as Much*, N.Y. TIMES, Aug. 10, 2013 at A11 (noting net losses of $740 million in the past quarter, $1.9 billion in the previous quarter, and a congressional mandate to pay $5.5 billion annually into a health fund for future retirees), NEPA's obligations "cannot be evaded because compliance may be inconvenient or time-consuming," *RESTORE*, 968 F. Supp. at 178.

As the Second Circuit noted when it first held that NEPA's mandates applied to USPS:  "While Congress has made the Service less like a government agency and more like a private business, the Service is still a hybrid; it does furnish an essential public service and has public functions and responsibilities."  *Chelsea Neighborhood Associations*, 516 F.2d at 385.  Given the potential serious environmental and aesthetic effects, the presence of a unique historical property, and USPS's serious deficiency in complying with NEPA, the balance of equities and public interest favors issuing a preliminary injunction.  *See Lands Council v. Cottrell*, 731 F. Supp. 2d 1074, 1092 (D.

Idaho 2010) ("In this case, however, failure to provide for an injunction would undermine the public's interest in ensuring that executive agencies follow the laws that govern their conduct.").  Further, given that a failure to issue a preliminary injunction would preclude further judicial review, there is no less drastic remedy available to redress these interests.  *Cf. Monsanto Co.* 130 S. Ct. at 2761 ("If a less drastic remedy (such as partial or complete vacatur of" the agency's decision) "was sufficient to redress respondents' injury, no recourse to the additional and extraordinary relief of an injunction was warranted.").

F.     **Remedy**

Although the Court concludes that the record demonstrates that USPS likely failed to comply with its obligations under NEPA, it will leave it to the agency to determine what steps it must take to come into compliance.  *See Hoffman*, 132 F.3d at 18 ("The district court overstepped the narrow confines of judicial review of an agency's decision when it jumped to the conclusion that the impact of the project would be 'arguably significant' and, on that basis, ordered the agency to prepare an EIS.").  Because this question is one that USPS "must decide, the appropriate remedy is to remand the case to the agency to correct the deficiencies in the record and in its analysis."  *Id.*

G.     **Bond**

A "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  A district court "is vested with wide discretion in the matter of security and it has been held proper for the court to require no bond where there has been no proof of likelihood of

harm, or where the injunctive order was issued to aid and preserve the court's jurisdiction over the subject matter involved." *Doctor's Associates, Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (quoting *Ferguson v. Tabah,* 288 F.2d 665, 675 (2d Cir. 1961) (internal quotation marks omitted)).

The purpose of the bond requirement is to assure "the enjoined party that it may readily collect damages from the funds posted in the event that it was wrongfully enjoined, and that it may do so without further litigation and without regard to the possible insolvency of the plaintiff." *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 557 (2d Cir. 2011). Although a wrongfully enjoined party will be "entitled to a presumption in favor of recovery," this presumption only "applies to 'provable' damages "proximately caused by the injunction, up to the amount of the bond." *Id.* at 559. "The wrongfully enjoined party must also properly substantiate the damages sought. However, the party's proof of damages does not need to be to a mathematical certainty." *Id.* (internal quotation marks and alterations omitted).

In NEPA cases seeking to vindicate the public interest, courts "have usually not required a bond at all or a nominal bond of one dollar." NEPA Law and Litig. § 4:53 (2013); *see also Davis v. Mineta*, 302 F.3d 1104, 1126 (10th Cir. 2002) ("Ordinarily, where a party is seeking to vindicate the public interest served by NEPA, a minimal bond amount should be considered."). A larger bond may also be required so long as it does not "serve[] to thwart citizen actions." *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) (affirming a $50,000 bond in a NEPA case).

USPS seeks a bond of "at least" $1 million. (Reply at 10.) The asserted harms include the loss of approximately $20,000 in administrative costs and due diligence work

related to completing the Cappelli sale, and the possible need to expend that amount on a future sale if the Cappelli deal fails as a result of this action.  USPS also claims that it is "unlikely" that it would receive the same $4.3 million offer that it received from Cappelli in a future sale, because the next two highest offers to purchase the property in 2012 were for $3,250,000 and $3,000,000, and that even a future sale at those prices is not guaranteed, especially given recent reports of the poor conditions at the property.  (*Id.*; Fagan Aff., Exs. A and B; Lackey Decl. ¶ 8.)

USPS's asserted damages are largely speculative at this point, as it is uncertain what effect a delay will have on its ability to complete the sale to Cappelli, whether remarketing of the property will be necessary, and whether the price obtained in a future sale would be lower than the current sale.  Given Plaintiffs' strong showing on the merits and the public interest in ensuring compliance with NEPA, the Court concludes that no bond is warranted.  *See Davis v. Mineta*, 302 F.3d 1104, 1126 (10th Cir. 2002) ("[P]laintiffs' strong showing on the merits and the defendants' apparent prejudgment to proceed prematurely with the Project before the required environmental studies were considered suggests that a large bond should not be required.").

III.    **Conclusion**

For the reasons discussed above, Plaintiffs' Motion [Doc. # 2] for a Preliminary Injunction is GRANTED as to Count One.  Defendants are hereby PRELIMINARILY ENJOINED from selling or otherwise conveying title to the Atlantic Street Station pending further order of the Court.

The parties shall submit Fed. R. Civ. P. 26(f) reports by November 6, 2013, outlining their proposed schedule for producing the administrative record and other steps necessary to determine whether a permanent injunction should issue or whether the preliminary injunction should be dissolved.  A telephonic status conference is hereby scheduled for November 12, 2013 at 3:00 p.m.


IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 28th day of October, 2013.