UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

NATIONAL POST OFFICE COLLABORATE, *et al.*,
   *Plaintiffs*,

v.

PATRICK R. DONAHOE, *et al.*,
   *Defendants*.

Civil No. 3:13cv1406 (JBA)

September 12, 2014

**RULING ON DEFENDANTS' MOTION TO DISMISS COUNTS THREE
AND FOUR AND PLAINTIFFS' MOTION TO AMEND**

Defendants, the United States Postal Service ("USPS") and its Postmaster General, move [Doc. # 60] to dismiss Counts Three and Four of the Second Amended Complaint, which alleges a violation of the public trust doctrine and 39 U.S.C. § 403(c), prohibiting "discrimination" by USPS in providing postal services.  Plaintiffs the Center for Arts and Mindfullness ("CAM") and the National Post Office Collaborate (the "Collaborate") have each moved [Doc. ## 100, 102] to file a third amended complaint.[1]  For the reasons that follow, Defendants' Motion to Dismiss is granted and Plaintiffs' Motions to Amend are denied.

**I.    Facts**

The facts of this case are set forth in the Court's Ruling [Doc. # 52] Granting Plaintiffs' Motion for a Preliminary Injunction ("PI Ruling") in which the Court enjoined

---

[1] The proposed amendments would challenge the sufficiency of Defendants' environmental review and add a breach of contract claim challenging the bidding process for the Atlantic Street Station.  The parties agree that the proposed have no effect on the motion to dismiss Counts Three and Four.  (*See* Jt. Mot. Scheduling Order [Doc. # 93] at 3.)

Defendants from proceeding with the sale of the United States Post Office located at 421 Atlantic Street in Stamford, Connecticut (the "Atlantic Street Station"), concluding that Plaintiffs had demonstrated a likelihood of success on the merits of Count One, their claim under the National Environmental Policy Act ("NEPA").

After the Court's ruling, Plaintiffs filed [Doc. # 58] a Second Amended Complaint.[2]  Counts One and Two were stayed pending conclusion of Defendants' NEPA review (*see* Scheduling Order [Doc. # 56] ¶ 3), which was completed on March 18, 2014 with USPS issuing a Finding of No Significant Impact ("FONSI") after conducting an Environmental Assessment (*see* Defs.' Notice Regarding Completion of NEPA Review [Doc. # 92] at 1).

---

[2] This amended complaint eliminates Count Five, which alleged under 39 U.S.C § 404(d)(1) that USPS failed to comply with its administrative procedures for closing a post office.  Plaintiffs acknowledged that only the Postal Regulatory Commission had jurisdiction over this claim and asked the Court to assume jurisdiction because there was a government shutdown at the time the complaint was filed.  Once the government shutdown ended, this claim became moot.

II.	Discussion[3]

A.	Public Trust Doctrine (Count Three)[4]

In Count Three, the Collaborate contends that "the Stamford Post Office comprises a national historical and cultural resource subject to the protection of the [public trust] doctrine" (Collaborate's Opp'n [Doc. # 82] at 2) and is "a part of the people of southwestern Connecticut's common heritage" and "should be preserved for the public who paid for it" (2d Am. Compl. [Doc. # 58] ¶ 108).  The Collaborate requests that before any sale is allowed "this Court [should] require the USPS to show how the public's interest in preserving the Stamford Post Office and preserving access to the property and its architecture, will both be protected" and an "injunction should be granted until such showing is made."  (*Id.* ¶ 112.)  Defendants counter that the public trust doctrine "applies only to the states and only with respect to some state dealings with private parties" and that the "historically-rooted legal principles of public access to tidal lands that form the basis of the doctrine are simply not present here."  (Defs.' Mem. Supp. [Doc. # 60-1] at 6–7.)

---

[3] To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  Detailed allegations are not required but a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  Factual allegations must be enough to raise a right to relief above the speculative level."  *Twombly,* 550 U.S. at 555 (alterations in original).

[4] The Collaborate has opposed only Count Three and CAM only Count Four.

3

The public trust doctrine recognizes that "[a]t common law, the title and the dominion in lands flowed by the tide were in the king for the benefit of the nation" and that upon the creation of the United States "these rights, charged with a like trust, were vested in the original states within their respective borders, subject to the rights surrendered by the constitution to the United States." *Shively v. Bowlby*, 152 U.S. 1, 57 (1894). The doctrine recognizes that tidal waters "are of great value to the public for the purposes of commerce, navigation, and fishery" and provides that "[t]heir improvement by individuals, when permitted, is incidental or subordinate to the public use and right." *Id.* Thus, "the title and the control of them are vested in the sovereign, for the benefit of the whole people." *Id.*

In *Illinois Central Ry. Co. v. Illinois,* 146 U.S. 387 (1892), where the Supreme Court first recognized the public trust doctrine, the Illinois legislature had transferred ownership of the submerged area of the entire waterfront of Chicago, over 1000 acres, to a railroad company. Four years later, a new legislature sought to revoke the transfer, and was challenged by the railroad. The revocation was upheld by the Court, which described title to the land under the harbor as

> different in character from that which the state holds in lands intended for sale. It is different from the title which the United States holds in public lands which are open to preemption and sale. It is a title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have the liberty of fishing therein freed from the obstruction or interference of private parties.

*Id.* at 452.

The public trust doctrine does not apply to the federal government, however, and the Supreme Court recently noted that "the public trust doctrine remains a matter of state

4

law." *PPL Montana, LLC v. Montana*, 132 S. Ct. 1215, 1235 (2012); *see also Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 285 (1997) ("*Illinois Central* was 'necessarily a statement of Illinois law.'" (quoting *Appleby v. City of New York,* 271 U.S. 364, 395 (1926)).

Thus, the public trust doctrine is a limitation on the ability of states to deny access to navigable waters and the Supreme Court has expressly distinguished navigable waterways as "different in character" from "the title which the United States holds in public lands which are open to preemption and sale." *Illinois Central,* 146 U.S. at 452. Additionally, the Constitution expressly provides that "Congress shall have Power to dispose of . . . Property belonging to the United States," U.S. Const. art. IV, § 3, cl. 2, and the Supreme Court has recognized that the federal government has "the rights incident to ownership" of public land under the Constitution, *Light v. United States*, 220 U.S. 523, 536 (1911) (internal quotation marks omitted).

Congress has authorized USPS to exercise the government's constitutional authority to dispose of real property under 39 U.S.C. § 401(5), which authorizes USPS "to acquire, in any lawful manner, such personal or real property, or any interest therein, as it deems necessary or convenient in the transaction of its business; to hold, maintain, sell, lease, or otherwise dispose of such property or any interest therein; and to provide services in connection therewith and charges therefor." Accordingly, even to the extent that the public trust doctrine imposes independent duties upon the states when it applies, under the Constitution, the government is explicitly authorized to dispose of its property and Congress has authorized USPS to exercise this authority.

Notwithstanding the particular history underlying the public trust doctrine and Congress's affirmative authority, delegated to USPS, to dispose of federal property, the Collaborate contends that the public trust doctrine has been applied beyond the context of navigable waters to a variety of fields and to the federal government. (Collaborate's Opp'n at 11.) The cases cited by the Collaborate, however, discuss the federal government's ability to bring affirmative litigation on behalf of the public under the public trust doctrine—akin to the states' ability to bring suit in their *parens patriae* capacities; none hold that the doctrine is a limitation upon federal authority.

For example, in *United States v. Burlington N. R. Co.*, 710 F. Supp. 1286, 1287 (D. Neb. 1989), the United States sought to recover damages for lost wildlife caused by a fire in a waterfowl production area. In denying the defendant's motion for summary judgment, the court noted that while "the public trust doctrine has traditionally been asserted by the States, the doctrine has also been applied to the Federal Government," but "without passing on the merits of the parties' arguments," it concluded that summary judgment was not warranted because "it appears that the United States, much like the States in their *parens patriae* capacities, can maintain an action to recover for damages to its public lands and the natural resources on them, which in this action would encompass the destroyed wildlife." *Id.* (internal citations omitted); *see also United States v. Beebe*, 127 U.S. 338, 342 (1888) ("The public domain is held by the government as part of its trust. The government is charged with the duty, and clothed with the power, to protect it from trespass and unlawful appropriation, and, under certain circumstances, to invest the individual citizen with the sole possession of the title which had till then been common to all the people as the beneficiaries of the trust."); *Light*, 220 U.S. at 536 (affirming the

authority of the United States to enjoin the defendant from pasturing his cattle on public land and noting that the "United States can prohibit absolutely or fix the terms on which its property may be used").

Other cases cited by the Collaborate refer to duties under state law. *See Nat'l Audubon Soc'y v. Superior Court*, 33 Cal. 3d 419, 437 (1983); *Ctr. for Biological Diversity, Inc. v. FPL Grp., Inc.*, 166 Cal. App. 4th 1349, 1360 (2008) ("The California Supreme Court has unequivocally embraced and expanded the scope of the public trust doctrine insofar as it relates to tidal and navigable bodies of water."); *Casitas Mun. Water Dist. v. United States*, 102 Fed. Cl. 443, 458 (Fed. Cl. 2011) (discussing public trust doctrine under California law in a regulatory takings claim). As Defendants note, the Collaborate has not identified a single instance in which the public trust doctrine has been applied to limit the federal government's authority to dispose of real property. (*See* Reply [Doc. # 88] at 2.) Because the Collaborate seeks to impose a limitation on federal authority that extends far beyond the historical underpinnings of the public trust doctrine and is inconsistent with USPS's constitutionally delegated authority to dispose of federal property, Defendants' Motion to Dismiss is granted as to Count Three.

### B.   39 U.S.C. § 403(c) (Count Four)

In Count Four, CAM alleges that USPS violated 39 U.S.C. § 403(c) by "discriminating" against it in selecting a competing purchaser for the Atlantic Street Station. (*See* 2d Am. Compl. ¶¶ 113–128.) Plaintiffs seek relief enjoining the Postal Service from "granting an undue and unreasonable preference" to Cappelli Enterprises and requiring the Postal Service to give CAM "a full and fair opportunity to purchase" the

7

Atlantic Street Station. (*Id.* at 27.) USPS contends that this claim fails because (1) the Court lacks jurisdiction over the claim and (2) CAM has not stated a claim for relief.

In its Ruling and Order [Doc. # 53] discharging CAM's *lis pendens* on the Atlantic Street Station (the "*Lis Pendens* Ruling"), the Court already concluded that it lacked jurisdiction under 39 U.S.C. § 403(c), which provides that USPS shall not "make any undue or unreasonable discrimination among users of the mails, nor shall it grant any undue or unreasonable preferences to any such user" in "providing services and in establishing classifications, rates, and fees."

Pursuant to 39 U.S.C. § 3662(a), "[a]ny interested person . . . who believes the Postal Service is not operating in conformance with the requirements" of § 403(c) "may lodge a complaint with the Postal Regulatory Commission ['PRC'] in such form and manner as the Commission may prescribe." Appeals of PRC decisions may be taken exclusively to the United States Court of Appeals for the District of Columbia. *See* 39 U.S.C. § 3663. Plaintiffs contended that jurisdiction was nevertheless proper pursuant to 39 U.S.C. § 409(a) which provides that "[e]xcept as otherwise provided in this title, the United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service" and that the use of the permissive word "may" in § 403(c) does not confer exclusive jurisdiction on the PRC. The Court rejected this argument, relying upon *LeMay v. U.S. Postal Serv.*, 450 F.3d 797, 800 (8th Cir. 2006) and other cases holding "that Congress intended to remove consideration of postal service complaints from the courts altogether." (*See Lis Pendens* Ruling at 5–7.)

CAM contends that "there is every reason for the Court to change that conclusion" (CAM's Opp'n [Doc. # 83] at 2) and thus tacitly acknowledges that it is

8

essentially moving for reconsideration of the *Lis Pendens* Ruling. However, such a motion would be untimely. *See* D. Conn. Loc. Civ. R. 7(c)1 ("Motions for reconsideration shall be filed and served within fourteen (14) days of the filing of the decision or order from which such relief is sought . . . ."). Further, the doctrine of the law of the case "posits that if a court decides a rule of law, that decision should continue to govern in subsequent stages of the same case." *Aramony v. United Way of Am.*, 254 F.3d 403, 410 (2d Cir. 2001) (quoting *In re Crysen/Montenay Energy Co.*, 226 F.3d 160, 165 n. 5 (2d Cir. 2000). "Courts apply the law of the case doctrine when their prior decisions in an ongoing case either expressly resolved an issue or necessarily resolved it by implication." *Id.* Although there is a general reluctance to reopen a ruling once made, "the law of the case doctrine is discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment." *Id.* (quoting *In re Crysen/Montenay,* 226 F.3d at 165 n. 5).

Although the Court retains discretion to reconsider its prior conclusion, CAM provides no convincing reason for the Court to do so and simply reiterates the same arguments that the Court previously rejected in finding that it lacked jurisdiction. Even if this Court had jurisdiction, it is doubtful that § 403(c)'s prohibition on discrimination in "providing services and in establishing classifications, rates, and fees" applies to USPS's disposal of real property. As made clear elsewhere in the United States Code, it appears that § 403(c) refers to USPS's "basic function" and "obligation to provide postal services to bind the Nation together through the personal, educational, literary, and business correspondence of the people." 39 U.S.C. § 101. The prohibition on discrimination in the provision of services appears logically related to its mandate to "provide prompt,

reliable, and efficient services to patrons in all areas," including "rural areas, communities, and small towns where post offices are not self-sustaining" and operate at a loss. *Id.* § 101(b)–(c).

At oral argument, CAM suggested that § 403(c) applies more broadly to actions that are "service related" and because the sale of a post office will have an impact on the services that USPS provides, it falls within § 403(c). (*See* Oral Argument Tr. [Doc. # 116] at 46.) However, CAM's argument has no logical stopping point and counsel for CAM could not identify any actions taken by USPS that would not be covered by its proposed interpretation of § 403(c). (*Id.* at 46–47.) Contrary to CAM's assertion, the statutory framework and plain meaning of "providing services" makes clear that selling post offices is not a "service" that USPS provides but rather is an exercise of its general powers to facilitate the provision of services. *See* 39 U.S.C. § 401(5) (defining USPS's "general powers" to include the ability to acquire and dispose of real property "as it deems necessary or convenient in the transaction of its business . . . and to provide services in connection therewith and charges therefor"); *see also* 39 U.S.C. § 102(5) (defining "postal service" as "the delivery of letters, printed matter, or mailable packages, including acceptance, collection, sorting, transportation, or other functions ancillary thereto").

This conclusion is reinforced by the fact that by its own terms § 403(c) prohibits only "discrimination among users of the mails." Although CAM contends that it is a "user[] of the mails," because it uses the mail in the ordinary course of its business (*see* Oral Argument Tr. at 49), in this case it does not seek to vindicate rights in its capacity as

10

a USPS customer. Rather, its claims are based on its status as a disappointed bidder for real property.[5] Accordingly, Defendants' Motion to Dismiss is granted as to Count Four.

### C.     Motions for Leave to Amend the Complaint

CAM seeks leave to amend the complaint to add a Count Seven, alleging breach of contract arising from its failed attempt to purchase the Atlantic Street Station in 2012 and the Collaborate seeks to add a claim under the Administrative Procedure Act ("APA") as a means of challenging the sufficiency of USPS's environmental review under NEPA, which resulted in a FONSI.

While Rule 15(a)(2) provides that the "court should freely give leave" to amend a complaint "when justice so requires," once a court has issued a scheduling order setting a deadline for amended pleadings, Rule 16(b)(4) provides that the resulting "schedule may be modified only for good cause." The Second Circuit has held that "the Rule 16(b) 'good cause' standard, rather than the more liberal standard of Rule 15(a), governs a motion to amend filed after the deadline a district court has set for amending the pleadings" and "a district court does not abuse its discretion in denying leave to amend the pleadings after the deadline set in the scheduling order where the moving party has failed to establish good cause." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000).

In its scheduling order, the Court set a deadline of November 19, 2013 for the filing of any additional amendments to the complaint.[6] (*See* Scheduling Order [Doc.

---

[5] Even if § 403(c) applied to USPS's sale of property, given that CAM failed to submit a contractually mandated deposit for the Atlantic Street Station, it does not appear that USPS "discriminated" against it by accepting another offer.

[6] In their Reply briefs [Doc. ## 104–105], Plaintiffs contend that their amended pleadings were offered within the time period set by the Court's amended scheduling

# 56] ¶ 1.)  As Plaintiffs moved to amend the complaint on April 25, 2014, well after this deadline, they must show good cause for the Court to do so.

In determining if a party has shown good cause to amend a complaint, "the primary consideration is whether the moving party can demonstrate diligence.  It is not, however, the only consideration.  The district court, in the exercise of its discretion under Rule 16(b), also may consider other relevant factors including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants."  *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007).  Plaintiffs have offered no justification for failing to move to amend the complaint earlier.  CAM's proposed breach of contract claim is based on the same facts known to it in September 2012 when it learned that it lost the bid for the Atlantic Street Station.  Likewise, the Collaborate could have included its challenge to USPS's environmental

---

order.  However, the Court's Scheduling Order of November 18, 2013, set a deadline for the filing of Plaintiffs' amended complaint.  In contrast, the Court's order of April 4, 2014 granted [Doc. # 94] the parties' Joint Motion [Doc. # 93] for a scheduling order in which Plaintiffs' requested a deadline of April 18, 2014 (later extended [Doc. # 101] to April 25, 2014) to file a *motion* to amend the complaint, not to file an amended complaint itself.  (*See* Jt. Mot. at 3.)  Defendants' explicitly withheld consent to the motion for an amended complaint.  (Jt. Mot. at 2–3.)   Thus, in setting a deadline for Plaintiffs' instant motions, the Court did not imply that these motions would be granted or that the filings of these motions were timely.  Although Plaintiffs contend that the November 18, 2013 Order was limited to directing Plaintiffs to file an amended complaint that would eliminate the moot Count Five and that it did not preclude subsequent amendments (*see* Oral Argument Tr. at 53), the Court's Order was not so limited and provided a deadline for the amended complaint that "include[ed] elimination of Count 5," which plainly indicates that additional amendments could have been included.

review under the APA when it filed its original complaint instead of just alleging a NEPA violation.[7]

Despite Plaintiffs' lack of diligence in moving to amend, they contend that no prejudice would result because this case is still in its early stages.  (*See, e.g.,* CAM's Reply at 3.)  However, the Court has now dismissed Counts Three and Four and the parties have already cross moved [Doc. ## 111, 119] for summary judgment on the remaining counts.  Thus, as USPS contends, it would be substantially prejudiced by the untimely amendments to the complaint, because Plaintiffs' new claims would require additional discovery and an additional round of briefing on dispositive motions (*see* Oral Argument Tr. at 54), which would further delay USPS from potentially being able to proceed with the sale of the Atlantic Street Station, which it has been preliminarily enjoined from selling for nearly ten months.

Accordingly, the Court concludes that Plaintiffs have not demonstrated good cause for their untimely motions to amend the complaint and that Defendants would be prejudice by untimely amendment.  Although this is sufficient reason to deny Plaintiffs' motions, the Court also concludes that the proposed amendments are futile and would deny the motions to amend on this basis as well.

---

[7] Although USPS did not complete its environmental review resulting in a FONSI until March 18, 2014, the operative complaint already alleges a NEPA violation and the Collaborate need not "amend" this complaint to challenge the FONSI, but rather can supplement the pleadings under Rule 15(d), which provides that "the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."

### 1. *CAM (Breach of Contract)*

As set forth in the Court's Preliminary Injunction Ruling, in June 2012, CAM submitted a $5.5 million bid to purchase the property, and in July 27, 2012, it submitted a signed Agreement of Purchase and Sale, a lease agreement so that USPS could continue to occupy the Atlantic Street Station until it found a suitable replacement, and an escrow agreement. Four days later, CAM sought an additional six months to raise development money and a $200,000 reduction in the purchase price to cover the removal of asbestos and paint. On August 2, 2012, CAM submitted a new offer that USPS considered to be considerably less appealing and the parties resumed negotiations with CAM submitting a second offer on September 4, 2012. (*See* PI Ruling at 6–7.) According to CAM's proposed amended complaint, the parties reached an agreement on this second offer, which required CAM to submit a $500,000 deposit on the date the agreement was signed. (*See* CAM's Proposed 4th Am. Compl. [Doc. # 102-2] ¶ 171.) CAM executed the agreement on September 5, 2012, but did not submit the deposit. (*Id.* ¶¶ 172–73.) Nevertheless, USPS signed the agreement the following day, and thus the contract went into effect. (*Id.* ¶ 174–75.) On September 13, 2012, CAM requested an additional five days to submit the deposit, but never did so. (*See* PI Ruling at 6–7.)

After CAM's failure to submit the deposit, USPS entered into negotiations with the next highest bidder, Cappelli. On December 21, 2012, Cappelli submitted a signed purchase and sale agreement to purchase the property for $4,300,000, along with an initial deposit of $100,000. USPS accepted this offer on December 27, 2012 (*id.* at 7–8), but CAM alleges that USPS "did not formally terminate" its agreement with CAM before doing so (CAM's Proposed 4th Am. Compl. ¶ 179).

14

CAM thus contends that its proposed breach of contract claim would be "based on the fact that CAM entered into a purchase and sale agreement with USPS" and that "[n]evertheless, and without ever formally terminating the September 2012 P&S, the USPS entered into purchase and sale agreement for the same property with real estate developer Cappelli."  (CAM's Mem. Supp. [Doc. # 102-1] at 2.)  Although CAM never submitted its required deposit to purchase the Atlantic Street station, it contends that this failure does not undermine the enforceability of the sales contract because USPS waived this requirement by signing the agreement without demanding that CAM simultaneously submit a deposit.  (CAM's Reply at 8.)

CAM further contends that "USPS is estopped from denying that the September 2012 P&S is fully enforceable because it engaged in conduct during the course of its negotiations with CAM pursuant to which it made a series of misrepresentations about or failed to disclose to CAM what terms the USPS would be willing to accept from a prospective buyer."  (*Id.*)  For example, CAM contends that in negotiations, USPS represented that it would not accept any deal with a purchase price under $5 million and with terms regarding the execution and deposit terms that CAM sought.  Nevertheless, CAM contends, "USPS entered into a purchase and sale contract with Cappelli in November 2012 that included starkly different terms [that] USPS had stated to CAM would not be available to a prospective buyer."  (CAM's Mem. Supp. at 3.)

Finally, CAM contends that USPS failed to disclose that the USPS representative negotiating the deal, David Rouse, was contemplating leaving USPS and taking a position with C.B. Richard Ellis, Inc., USPS's exclusive broker for the sale of real property, and did

15

so a few weeks after the September 2012 purchase and sale agreement with CAM was executed. (*Id.*)

In its proposed sixth prayer for relief, CAM requests (1) an order setting aside USPS's sales agreement with Cappelli and (2) an injunction allowing CAM to purchase the property under the terms offered to Cappelli. (CAM's Proposed 4th Am. Compl. at 34.) USPS thus contends that "CAM's proposed claim does not actually seek any remedy with respect to the alleged sales agreement between the Postal Service and CAM" and "is actually a challenge to a Postal Service contracting decision by an unsuccessful and disappointed potential contractor." (Defs.' Opp'n [Doc. # 103] at 6–7.)

USPS contends that the remedy sought by CAM is not available, because under sovereign immunity a party cannot maintain a suit against the United States for specific performance. However, "[a]lthough there remains some disagreement, most courts have held that a claim brought against the USPS in its own name is not a claim against the United States." *Beckman v. U.S. Postal Serv.*, 79 F. Supp. 2d 394, 406 n.14 (S.D.N.Y. 2000) (collecting cases); *but see West v. Potter*, 540 F. Supp. 2d 91, 98 (D.D.C. 2008) ("West is barred from seeking specific relief from the Postal Service for breach of contract."). Even if sovereign immunity does not bar CAM from seeking specific performance, the USPS-CAM contract provides that "[u]nder no circumstance shall Buyer be entitled to specific performance of this Agreement."[8] (*See* Agreement of Purchase and Sale, Defs.' Ex. 1 ¶ 6.9.3.)

---

[8] Additionally, because CAM seeks an order setting aside USPS's sales agreement with Cappelli, it seeks more than merely specific performance, but rather the invalidation

16

CAM did not address this provision in its briefing and at oral argument suggested that USPS should be estopped from asserting reliance on this provision because of its inequitable conduct during purchase negotiations.  (Oral Argument Tr. at 51.)  However, this provision is contained within the September 2012 contract that CAM contends USPS should be "estopped from denying . . . is fully enforceable."  (CAM's Mem. Supp. at 2.)  Thus, even if CAM were correct that its September 2012 contract with USPS should be construed as still being enforceable, it offers no sound justification why the provision in this contract precluding specific performance would not also be intact.  Accordingly, CAM's proposed amendment to the complaint seeking specific performance and nullification of the Cappelli contract would be futile.

### 2. *The Collaborate (APA Claim)*

The Collaborate seeks to amend the complaint to add an APA claim in order to challenge USPS's NEPA environmental review.  However, as discussed *supra* at Note 7, the Collaborate need not amend the complaint to challenge the FONSI but rather can move to supplement the pleadings under Rule 15(d) to address subsequent events in Defendants' environmental review.  USPS explains that "[i]f changes in the nature of supplementation were the extent of the Collaborate's proposed changes, Defendants probably would not have opposed the Collaborate's motion" and USPS has "no objection to the Collaborate's complaint referencing an arbitrary and capricious-like standard of review or even citing to [the APA] as a comparative reference.  But Defendants strongly

---

of a separate contract.  However, it cites no authority for the Court to invalidate this contract.

object to the Collaborate's effort to expand that comparative reference into a new claim applying the entire APA to the Postal Service." (Defs.' Opp'n at 13–14.)

Although USPS is generally exempt from the APA and other federal laws "dealing with . . . property," *see* 39 U.S.C. § 410(a), the Second Circuit determined that Congress saw NEPA as "unusually important" and intended for it to apply broadly even to USPS, which "does furnish an essential public service and has public functions and responsibilities." *Chelsea Neighborhood Ass'ns v. U.S. Postal Serv.*, 516 F.2d 378, 383–86 (2d Cir. 1975). As the Court has previously noted (*see* PI Ruling at 15), because NEPA does not provide a private right of action, courts review such claims against federal agencies under the APA. *Brodsky v. U.S. Nuclear Regulatory Comm'n*, 704 F.3d 113, 119 (2d Cir. 2013) ("Because NEPA does not itself provide for judicial review, the APA controls.").

Confronted with the apparent conflict that NEPA, but not the APA, applies to USPS but that NEPA claims are generally reviewed under the APA, USPS contends that the Second Circuit in "*Chelsea* only held that a *standard of review* like that found in the APA—*not the APA itself*—applied when reviewing the Postal Service's compliance with NEPA" and "that does not mean the APA applies to the Postal Service." (Defs.' Opp'n at 12.) Given the absence of a private right of action in NEPA, however, USPS acknowledged at oral argument that its position leaves unanswered the question of how courts review NEPA claims against USPS if not under the APA. (Oral Argument Tr. at 60 ("I think that's a question for the Second Circuit.").)

The Court need not resolve this unanswered question, however, because there is no dispute that the "arbitrary and capricious" standard of review applies to the existing

18

NEPA claim.  At oral argument, the Collaborate explained that it sought to add the APA claim as a "belt and suspenders" precaution and represented that its "intent is limited to allowing the Court to use the Administrative Procedure Act as a vehicle to adjudicate the postal service's actions on the limited facts of this case" and it does not seek to introduce any new evidence or arguments.  (*Id.* at 57–59.)  Given, however, that the Collaborate has already pled a NEPA claim and the APA does not otherwise apply to USPS, the Collaborate does not need both belts and suspenders and its proposed amendment would not alter its NEPA claim and would otherwise be futile.  Accordingly, the Collaborate's Motion to Amend is denied.

III.   **Conclusion**

For the reasons set forth above, Defendants' Motion [Doc. # 60] to Dismiss Counts Three and Four is GRANTED and Plaintiffs' Motions [Doc. ## 100, 102] to Amend are DENIED.

			IT IS SO ORDERED.

			      /s/
			Janet Bond Arterton, U.S.D.J.


		Dated at New Haven, Connecticut this 12th day of September, 2014.