UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| NATIONAL POST OFFICE COLLABORATE, *et al.*,<br>         *Plaintiffs*,<br>     *v.*<br>PATRICK R. DONAHOE, *et al.*,<br>         *Defendants*. | Civil No. 3:13cv1406 (JBA)<br><br><br>November 26, 2014 |

**RULING ON MOTIONS FOR SUMMARY JUDGMENT**

Defendants, the United States Postal Service ("USPS") and its Postmaster General, and Plaintiff the National Post Office Collaborate (the "Collaborate") have cross moved [Doc. ## 111, 119] for summary judgment on Plaintiffs' complaint alleging violations of the National Environmental Policy Act ("NEPA") and the National Historic Preservation Act ("NHPA").  For the reasons that follow, Defendants' Motion for Summary Judgment is granted and Plaintiff's is denied.

**I.     Background**

Plaintiffs National Post Office Collaborate ("the Collaborate"), Center for Art and Mindfulness (CAM), and Kaysay Abrha, filed [Doc. # 1] suit on September 25, 2013, challenging the Postal Service's sale of the United States Post Office located at 421 Atlantic Street in Stamford, Connecticut (the "Atlantic Street Station").  On October 28, 2013, the Court preliminarily enjoined USPS "from selling or otherwise conveying title to the Atlantic Street Station pending further order of the Court," concluding that Plaintiffs had demonstrated a likelihood of success on the merits of their NEPA claim.  (Ruling [Doc. # 52] Granting Pls.' Mot. for Prelim. Inj. (the "PI Ruling") at 39.)  That injunction remains in effect.  Two counts remain in Plaintiffs' Second Amended Complaint.  Count

One alleges a violation of NEPA.  (2d Am. Compl. ¶¶ 76–93.)  Count Two alleges a violation of NHPA Section 106.[1]

The Atlantic Street Station, constructed in 1916, is a historic building that in 1985 was listed by the United States Department of the Interior on the National Register of Historic Places.  (National Register of Historic Places Inventory—Nomination Form ("Nomination Form") at AR000066[2].)  The Nomination Form describes its American-Italianate architecture as representing an unusual style choice for a New England post office, and it appears to be one of the last post offices individually designed before the government adopted a policy in 1915 to save money by standardizing the construction planning, and producing similar post offices in many communities.  (*Id.* at AR000068.)

The Atlantic Street station is set on a pink granite base, "one monumental story [in] height" and constructed with steel framing and buff-colored masonry and trimmed in off-white cast terra cotta ornament with bright colored accents.  The main façades are broken up into bay with each containing a "monumental arched bronze window" with terra cotta ornaments.  The roof is hipped red clay and sits atop a dark brown bracketed wood projecting eave.  (*Id.*)  A raised entrance plaza with monumental granite steps and balustrades leads to a landscaped terrace enclosed on two sides by the projecting wings of the structure.  The plaza "features two symmetrically placed bronze and white glass

---

[1] On September 12, 2014, the Court granted [Doc. # 129] Defendants' Motion to Dismiss Counts Three and Four, alleging a violation of the public trust doctrine and 39 U.S.C. § 403(c) in deciding to sell the property to Cappelli rather than Plaintiff CAM.

[2] Citations to "AR" refer to the administrative record, which was manually filed with the Court.  (*See* Notice of Filing of Admin. Record [Doc. # 99].)

lantern-type light fixtures of monumental scale as well as unusual and interesting plantings." (*Id.*)

The interior lobby runs the width of the terrace with brown clay tile floors trimmed in pink and white marble "and features high vaulted plaster ceiling (said to have been originally decorated with colorful murals) and bronze vestibules and windows." (*Id.*)  A major addition was constructed in the rear of the original building in 1939, which was "sympathetic in detailing and only slightly less elaborate in exterior ornamentation." (*Id.*)  The architect submitting the National Register of Historic Places nomination form in 1985 noted that as the development of nearby high rises continued, "this space defined by the plaza, street, and Post Office will become more important as an urban space and reminder of the older scale and history of the City." (*Id.*)

In 2012, USPS marketed the Atlantic Street Station for sale and originally accepted CAM's offer but after it failed to submit the required deposit, agreed to sell the property to Cappelli Enterprises ("Cappelli").  (PI Ruling at 6–7.)  Cappelli plans to "preserve[] and enhance[]" the 1916 structure to house a restaurant with an outdoor dining area in the Station's front entrance plaza.  It will construct two 22-story towers to its north and west. (Atlantic Street Station Enhancement Plan at AR004746–52.)  Cappelli originally planned to demolish the 1939 annex but has modified its parking plans to preserve it and will cut a portal through the westerly two arch windows of the annex for vehicular access.  (*See* Cappelli Aff. ¶ 3, Ex. C to Defs.' Mem. Supp. [Doc. # 119].)

A.    **NEPA Review**

In connection with the Cappelli sale, USPS concluded that it was not required to conduct an environmental review under NEPA, because a categorical exclusion applied

for the "[a]cquisition and disposal through sale, lease, transfer or exchange of real property that does not involve an increase in volumes, concentrations, or discharge rates of wastes, air emissions, or water effluents, and that under reasonably foreseeable uses, have generally similar environmental impacts as compared to those before the acquisition or disposal." 39 C.F.R. § 775.6(e)(8). In issuing a preliminary injunction, the Court concluded that "USPS's application of the categorical exclusion to the Cappelli sale and conclusion that the construction of two residential towers would have 'generally similar environmental impacts' to the operation at that site of a historic post office appears to be" arbitrary and capricious, but left it to USPS "to determine what steps it must take to come into compliance" with NEPA. (PI Ruling at 29, 36.)

After the PI Ruling, USPS undertook an Environmental Assessment ("EA") for the planned sale, posted a notice of intent for the EA at several locations in Stamford, and notified Plaintiffs and Federal, State, and local regulatory agencies. (AR004761; AR04762–75.) The EA (AR004776–878) was completed in January 2014, and on January 20, 2014, Defendants sent notice to Plaintiffs and numerous state and local governmental agencies about the EA's availability. (AR004890–901.) USPS accepted public comment on the EA until February 14 and received comments from only Plaintiffs National Post Office Collaborate and CAM. (AR005125–31; AR005145; AR005152.)

On February 7, 2014, the Collaborate submitted its Response to the EA (AR004943–5124), which included an analysis completed by environmental consultant Fuss & O'Neill. This analysis claimed four substantive deficiencies in the EA, which echo the Collaborate's claims in this Motion and are discussed in greater detail *infra*: (1) that the EA contained insufficient analysis of alternatives to the proposed action; (2) that there

4

was insufficient analysis of cumulative impacts from USPS's national initiative to sell other postal facilities throughout the country; (3) that USPS's consultation with the state historic preservation office regarding historical resources was inadequate; and (4) that the EA did not adequately evaluate potential impacts for several resource categories, including traffic, air quality, and community services and utilities. (*Id.*)

Because of the limited response from the public, USPS declined to hold a public hearing on the EA and made a Finding of No Significant Impact ("FONSI") on March 18, 2014, determining that a full environmental impact statement was not required for the planned sale. (AR005152; AR005145–235.) In an April 9, 2014, Record of Environmental Consideration, the Postal Service formally concluded that the FONSI had completed its NEPA review for the planned sale. (AR005295.)

## II.    Standing[3]

The Supreme Court has "established that the irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A "party must demonstrate that (1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. The 'injury in fact' requirement has been characterized as 'an invasion of a

---

[3] Plaintiffs, as the parties asserting federal jurisdiction, bear the burden to establish their standing. *Natural Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 79 (2d Cir. 2013). "To defend against summary judgment for lack of standing, a plaintiff 'must set forth by affidavit or other evidence specific facts' supporting standing, as is generally required under Rule 56." *Id.* (quoting *Lujan*, 504 U.S. at 561).

legally protected interest.'" *Green Island Power Auth. v. F.E.R.C.*, 577 F.3d 148, 159 (2d Cir. 2009) (internal quotation marks, citations, and alterations omitted).  "A plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future." *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998).

"[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)).  "It is well settled that, in a NEPA suit, 'a cognizable procedural injury exists when a plaintiff alleges that a proper [environmental impact statement] has not been prepared . . . when the plaintiff also alleges a concrete interest— such as an aesthetic or recreational interest—that is threatened by the proposed actions.'" *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1171 (11th Cir. 2006) (quoting *Sierra Club v. Johnson*, 436 F.3d 1269, 1277 (11th Cir. 2006)).

"An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. at 181.

Defendants contend that Plaintiffs have failed to demonstrate a concrete interest or injury in fact to support their standing.  (Defs.' Reply [Doc. # 128] at 1.)  In response to Defendants' challenge to their standing, the Collaborate has submitted a number of

6

declarations from its members and CAM to show their interests in this litigation and at oral argument Plaintiffs acknowledged that these declarations are the only evidence that support their standing.  Jaquelyn McCormick, the Executive Director of the Collaborate, describes the organization as having the "goal of preserving and retaining public ownership of access to historic community post offices" and contends that its members' interests "in preserving and maintaining the historic post office building for present and future generations" will be injured by the proposed development.  (McCormick Decl., Ex. A to Collaborate's Reply [Doc. # 124] ¶¶ 4, 14–15.)  Wes Haynes, a member of the Collaborate and Stamford resident, contends that he has been "personally inconvenienced" by the closure of the Atlantic Street Station, because the new post office is three miles farther from his home.  (Haynes Decl., Ex. B to Collaborate's Reply ¶¶ 2, 4.)

The Collaborate contends that Mr. Haynes's declaration "establishes that the Collaborate's members, including himself and the [Historic Neighborhood Preservation Program[4]] had a direct, concrete interest in the Atlantic Street Station Post Office, which included their prior use and enjoyment of the post office's aesthetic attributes" and that "[t]his concrete interest has been and will be harmed by the Postal Service's actions and continued noncompliance with NEPA and NHPA."  (Collaborate's Reply at 18.)  However, when an organization "has alleged no injury to itself as an organization, distinct from injury to its . . . members. . . . its claim to standing can be no different from those of the members it seeks to represent" and thus it must show that "'its members, or any one

---

[4] Mr. Haynes serves as the Executive Director of the Historic Neighborhood Preservation Program, which has as its purpose "to preserve, protect, and revitalize Stamford's historic built environment" and "considers itself to be a member of the Collaborate."  (Haynes Decl. ¶¶ 6, 8.)

of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.'" *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 477 n.14 (1982) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)).

While the McCormick Declaration establishes that the protection of historical post offices such as the Atlantic Street Station is germane to the Collaborate's purpose, *see Bldg. & Const. Trades Council of Buffalo, New York & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 147 (2d Cir. 2006) ("[T]oo restrictive a reading of the [germaneness] requirement would undercut the interest of members who join an organization in order to effectuate an effective vehicle for vindicating interests that they share with others." (quoting *Humane Society of the United States v. Hodel,* 840 F.2d 45, 56 (D.C. Cir. 1988)), there is no evidence that any of the Collaborate's members have suffered a concrete cognizable environmental injury.

The Collaborate is based in Berkley, California and Ms. McCormick does not allege that she has ever visited the Atlantic Street Station.  Mr. Hayes has likewise alleged only that he has suffered "inconvenience" from having to travel to a more distant replacement post office but has not detailed how he or any members have enjoyed the historic features of the Atlantic Street Station or how the sale will impact their future

enjoyment.[5]  A "generalized harm" to the Collaborate's interest in historical preservation
is insufficient to establish standing without evidence that the "harm in fact affects the
recreational or even the mere esthetic interests" of the Collaborate's members.  *Summers
v. Earth Island Inst.*, 555 U.S. 488, 494 (2009).  A "plaintiff must show that he has actual
aesthetic interest in the area affected by the" challenged environmental action, *Pollack v.
U.S. Dep't Of Justice*, 577 F.3d 736, 742 (7th Cir. 2009), and a plaintiff's burden is not
satisfied by conclusory averments, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990).
Thus, the Collaborate has not demonstrated that any of its members have suffered a
concrete cognizable injury sufficient to confer standing.  *See Jacobs*, 463 F.3d at 1171; *see
also Pollack*, 577 F.3d at 742 (holding that standing for a NEPA claim was not established
where the plaintiff "never claims that he visits" the area effected by the environmental
action).

The Collaborate also relies upon CAM's standing,[6] because "[s]o long as one party
has standing, other parties may remain in the suit without a standing injury."  *Ouachita
Watch League*, 463 F.3d at 1170 (citing *Clinton v. City of New York*, 524 U.S. 417, 434–36
(1998)).  Debra Sherwood, Executive Director, states that CAM's mission is "to establish

---

[5] Even if this "inconvenience" could suffice to establish Article III standing,
economic and other non-environment injuries are not within the "zone of interest"
protected by NEPA and thus are insufficient to confer statutory standing.  *See, e.g., ANR
Pipeline Co. v. F.E.R.C.*, 205 F.3d 403, 408 (D.C. Cir. 2000) ("NEPA, of course, is a statute
aimed at the protection of the environment" and "economic interest is not within the
zone of interests protected by NEPA.").

[6] Because CAM did not move for summary judgment, USPS initially contended
that it had abandoned its claims.  In response, CAM filed an opposition brief [Doc. # 123]
opposing USPS's motion and clarifying that it has not abandoned its claims but rather has
relied upon the Collaborate to prosecute and defend them.

an art and exhibition and art education community cultural center, with an emphasis on mindfulness in Stamford" and that the Atlantic Street Station was its favored location for the center "because of its architectural importance."   (Sherwood Decl., Ex. C to Collaborate's Reply ¶ 4.)

"As an organization dedicated to Mindful living, art and art education," Ms. Sherwood contends that CAM "has an interest in preserving the aesthetic architectural attributes and values of local historic and cultural resources" and that the proposed development, including cutting a hole through the 1939 annex to construct a road "will forever change the aesthetics and architectural configuration of the building" and CAM's and its members' "ability to enjoy the aesthetic attributes of the building." (*Id.* ¶¶ 5, 13.) Drew Backstrand, Secretary and a Director of CAM, contends that CAM "suffered economic harm" related to its expenses in attempting to purchase the Atlantic Street Station and Mr. Backstrand has personally "suffered loss with regard to the aesthetic aspects of the post office and its architectural features that will be altered" by the planned development.   (Backstrand Decl., Ex. D to Collaborate's Reply ¶ 7; *see also* Sherwood Decl. ¶ 14 (outlining CAM's litigation expenses to challenge USPS's environmental review).)

While these declarations contend that CAM and its members will suffer an aesthetic loss from the sale of the property, they contain only conclusory assertions of such a loss and like the Collaborate's declarations, they do not contain details, such as whether CAM members have visited and enjoyed the aesthetic aspects of the Atlantic Street Station in the past, which members in particular have done so, and whether they plan to return, and specifically how the sale will prevent them from enjoying its aesthetic

or architectural aspects.[7]  CAM's economic harm resulting from its failed attempt to purchase the property is not cognizable under NEPA's "zone of interest."  *See ANR Pipeline Co.,* 205 F.3d at 408.

The Collaborate also contends that standing lies from Plaintiff Kaysay Abrha, who is alleged to have held a post office box at the Atlantic Street Station before its closure. (2d Am. Compl. ¶ 4.)  However, no evidence has been submitted to support his standing under NEPA or NHPA and the only interest that has even been alleged as to Mr. Abrha relates to his loss of access to his post office box, not an environmental injury.[8]  Thus, Plaintiffs have not met their burden of demonstrating standing as to Mr. Abrha under NEPA and the NHPA.  *See Lujan,* 504 U.S. at 561.

Because there is no evidence that members of CAM or the Collaborate have suffered a concrete environmental injury, Plaintiffs lack standing to proceed.  Although the Court could grant Defendants summary judgment on that basis alone, it also concludes that Plaintiffs' claims fail on the merits.

---

[7] USPS also contends that CAM has failed to show that historic preservation is germane to its purpose as required for organizational standing.  (USPS Reply at 5.) However, the Sherwood Declaration contends that CAM is an organization "dedicated to Mindful living, art and art education" and "has an interest in preserving the aesthetic architectural attributes and values of local historic and cultural resources." (Sherwood Decl. ¶ 5.)  This appears to be sufficient to show germaneness.  *See Bldg. & Const. Trades Council of Buffalo,* 448 F.3d at 147.

[8] Additionally, Mr. Abrha has not participated in this case since the PI Ruling issued.  After the original counsel for Plaintiffs withdrew from this action and noted that "Mr. Abrha had not cooperated with counsel in the prosecution of this case or participated directly in the prosecution of this case" (Mot. to Withdraw [Doc. # 61]), Mr. Abrha has not entered a pro se appearance or otherwise participated in this suit.

III.    **Review on the Merits**[9]

A.    **NEPA**

Because NEPA does not provide private rights of action, courts review agency actions under the Administrative Procedures Act ("APA"), *Brodsky v. U.S. Nuclear Regulatory Comm'n*, 704 F.3d 113, 119 (2d Cir. 2013), under which courts review contested agency actions to determine if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).  An agency's actions are arbitrary and capricious if it "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,* 463 U.S. 29, 43 (1983)).  "Although highly deferential, this standard 'does not equate to no review.'" *Brodsky*, 704 F.3d at 119 (quoting *Wilson v. CIA,* 586 F.3d 171, 185 (2d Cir. 2009)).

---

[9] "'[W]hen a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal.  The entire case on review is a question of law.'  Judicial review of agency action is often accomplished by filing cross-motions for summary judgment. The question whether an agency's decision is arbitrary and capricious, however, is a legal issue, whether it is presented as a motion to dismiss or for summary judgment." *State of Connecticut v. U.S. Dep't of Commerce*, No. 3:04CV1271 (SRU), 2007 WL 2349894, at *1 (D. Conn. Aug. 15, 2007) (quoting *American Bioscience, Inc. v. Thompson,* 269 F.3d 1077, 1083–84 (D.C. Cir. 2001)).  "Generally, a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision." *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997).

NEPA requires federal agencies, including USPS,[10] to review the environmental impact of major federal actions significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C). The Supreme Court has stated that NEPA has twin aims. "First it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decision making process." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council*, 462 U.S. 87, 97 (1983) (internal citations and quotation marks omitted).

Under NEPA, an agency contemplating "major Federal actions significantly affecting the quality of the human environment" must prepare an Environmental Impact Statement ("EIS"). 42 U.S.C. § 4332(2)(c). The EIS demonstrates the agency's "consideration of the reasonably foreseeable environmental effects" of the contemplated action. *Brodsky*, 704 F.3d at 119.

---

[10] In order to allow USPS to operate its affairs in a "businesslike way," Congress provided in 1970 that "no Federal law[s] dealing with public or Federal contracts, property, works, officers, employees, budgets, or funds" apply to the USPS. 39 U.S.C. § 410(a). Despite this law, the Second Circuit determined that Congress saw NEPA as "unusually important" and intended for it to apply broadly even to USPS, which "does furnish an essential public service and has public functions and responsibilities." *Chelsea Neighborhood Ass'ns v. U.S. Postal Serv.*, 516 F.2d 378, 383–86 (2d Cir. 1975). USPS maintains that the Second Circuit did not specifically hold that the APA applies to USPS and thus Plaintiffs have not identified a valid cause of action to challenge USPS's NEPA compliance even if it is in fact subject to NEPA. (Defs.' Reply at 7.) As the Court has already concluded in the Ruling on Defendants' Motion to Dismiss [Doc. # 129], *Chelsea Neighborhood Ass'ns* held that there was a private right of action to challenge USPS's compliance with NEPA and whether it was reviewed under the APA or another source of a private right is not material, because the "arbitrary and capricious" standard of review indisputably applies. (*Id.* at 18–19.)

In order to reduce the administrative burden on agencies from NEPA, implementing regulations encourage agencies to develop "categorical exclusions" or categories of actions that do not individually or cumulatively have a significant effect on the environment, and therefore do not require an EIS absent "extraordinary circumstances." *See* 40 CRF § 1500.4(p); *see also Fund for Animals v. Babbitt,* 89 F.3d 128, 130 (2d Cir. 1996) (noting that "[t]he [Counsel on Environmental Quality] has authorized the use of categorical exclusions to promote efficiency in the NEPA review process").

If an agency's action is neither categorically excluded from nor clearly subject to the requirements of producing an EIS, an agency may prepare "a more limited document, an Environmental Assessment (EA)." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004). "The EA is a 'concise public document' that '[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS].'" *Id.* (quoting 40 C.F.R. § 1508.9(a)). "If, pursuant to the EA, an agency determines that an EIS is not required under applicable CEQ regulations, it must issue a 'finding of no significant impact' (FONSI), which briefly presents the reasons why the proposed agency action will not have a significant impact on the human environment." *Id.* at 758–59 (citing 40 C.F.R. §§ 1501.4(e), 1508.13). If an agency action is not subject to a categorical exclusion, "any doubt as to whether contemplated action requires an EIS must be resolved by preparing an EA." *Brodsky*, 704 F.3d at 120.

Because "NEPA is, at its core, a procedural statute that mandates a process rather than a particular result," a court's review "focuses primarily on the procedural regularity

of the decision, rather than on its substance." *Id.* at 118–19 (internal quotation marks

omitted).  The Second Circuit has

> consistently held that whether a particular agency action will have a
> "significant" effect on the environment is a substantive question left to the
> informed discretion of the agency proposing the action.  However, because
> NEPA provides a procedural framework within which such judgments
> must be made, courts are responsible for ensuring that agencies comply
> with the statutory duty imposed on them by Congress.  Therefore, in
> reviewing an administrative decision not to issue an EIS, a federal court
> must undertake a two-step analysis. First, we must consider whether the
> agency took a "hard look" at the possible effects of the proposed action.
> Second, if the agency has taken a "hard look," we must ask whether the
> agency"s decision was arbitrary or capricious.   Our inquiry must be
> "searching and careful," although the ultimate scope of judicial review is
> narrow. The judiciary must not inject itself into an area where the choice
> of action to be taken is one confided by Congress to the executive branch.

*Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997) (internal citations omitted).

Judicial review is guided by the "rule of reason," which assesses whether NEPA

review "has been compiled in good faith and sets forth sufficient information to enable

the decision-maker to consider fully the environmental factors involved and to make a

reasoned decision after balancing the risks of harm to the environment against the

benefits to be derived from the proposed action, as well as to make a reasoned choice

between alternatives."  *Suffolk Cnty. v. Sec'y of Interior*, 562 F.2d 1368, 1375 (2d Cir.

1977).

The Collaborate contends that because the Cappelli project was already a "done

deal" in the minds of USPS, they (1) failed to take a hard look at alternatives, (2) limited

public participation, and (3) failed to consider evidence of the cumulative impacts of

Defendants' national campaign to dispose of historic post offices.  (Collaborate's Mem. Supp. [Doc. # 112] at 23.)

On the first point, NEPA requires an EIS to "[r]igorously explore and objectively evaluate all reasonable alternatives" to a proposal, including the alternative of taking "no action."  40 C.F.R. § 1502.14.  NEPA "does not, however, require agencies to analyze the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or impractical or ineffective.  What is required is information sufficient to permit a reasoned choice of alternatives as far as environmental aspects are concerned." *Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1039–40 (10th Cir. 2001) (internal quotation marks and alterations omitted).

Like other NEPA determinations, this assessment of alternatives is governed by the deferential "rule of reason," *id.*, which "governs both *which* alternatives the agency must discuss, and the *extent* to which it must discuss them," *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991) (internal quotation marks omitted). Under the "rule of reason," "the agency itself is responsible for determining the range of alternatives to be considered." *City of New York v. U.S. Dep't of Transp.*, 715 F.2d 732, 742 (2d Cir. 1983).  "While an agency is not obliged to consider every alternative to every aspect of a proposed action, reviewing courts have insisted that the agency consider such alternatives to the proposed action as may partially or completely meet the proposal's goal."  *Id* at 742–43 (internal citations and quotation marks omitted).

Thus, a "proposed alternative is reasonable only if it will bring about the ends of the federal action" that is sought to be accomplished.  *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991) (citing *City of New York*, 715 F2.d at 742–43.)).

Where, as here, an EA rather than an EIS has been prepared, the discussion of alternatives need only be "brief."  40 C.F.R. § 1508.9; *see also Friends of Ompompanoosuc v. F.E.R.C.*, 968 F.2d 1549, 1558 (2d Cir. 1992) ("[T]he range of alternatives an agency must consider is narrower when, as here, the agency has found that a project will not have a significant environmental impact.").

Here, the EA defined USPS's objective as "selling the [Atlantic Street Station] . . . . because operations at this facilities are no longer required" to provide postal services. (AR004779.)  This purpose was described as being "consistent with national initiatives to improve the overall USPS financial condition, to review all underutilized properties and [to] generate revenue when deemed feasible."  (*Id.*)

At oral argument, the Collaborate acknowledged that USPS's objective was proper, but nevertheless faulted the agency for failing to consider alternatives, such as (1) leasing all or portions of the facility, (2) a preservation covenant requiring restoration of the building interior and/or preservation of the 1939 annex, or (3) reuses such as a library, museum, bank, theater, or courthouse.  (Collaborate's Mem. Supp. at 23–24 (citing F&O Review at AR004958).)  However, as the Collaborate further acknowledged at oral argument, USPS need only consider reasonable alternatives in light of the purpose of its federal undertaking and the Collaborate's briefing failed to analyze these alternatives in light of this purpose.  As USPS notes, each of these alternatives would require USPS to

17

maintain ownership of the Atlantic Street Station, which is contrary to its purpose in disposing of the facility to generate revenue.[11]

In light of the fact that the Atlantic Street Station was no longer in use, the agency's mission to "provide adequate and efficient postal services," 39 U.S.C. § 403(a), and its need to generate revenue, USPS's definition of the purpose of the proposed action and analysis of alternatives were reasonable. *See Earth Island Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1021 (9th Cir. 2012) ("[C]onsideration of a no action alternative and [the agency's] preferred action was not arbitrary and capricious under the less rigorous requirements of an EA (rather than an EIS)."); *Utah Envtl. Cong. v. Bosworth*, 439 F.3d 1184, 1195 (10th Cir. 2006) ("Given the Project's dual objectives and the agency's discretion to [choose] those objectives, the Forest Service examined a reasonable range of alternatives and did not act arbitrarily when it considered only the no-action alternative and the modified proposed action." (internal citation omitted)).

Next, the Collaborate contends that the EA failed to take the requisite "hard look" at environmental consequences of the proposed action because it limited public participation by allowing only a 14 day comment period on the EA. (Collaborate's Mem.

---

[11] CAM contends that USPS should have considered the alternative of selling the building to it rather than Cappelli. (CAM's Reply [Doc. # 123] at 6–7.) However, USPS's concededly proper purpose was more general—to sell the building to generate revenue, not to sell the building to any particular buyer. While the EA considered Cappelli's post-sale development plans, it was required to do so because it had already entered into an agreement with Cappelli to sell the property and thus Cappelli's development plans were "reasonably foreseeable" (AR04778), as the Court held in issuing a preliminary injunction. CAM had already failed in its attempts to purchase the property (*see* Ruling on Mots. to Dismiss and Amend the Complaint at 14) and thus CAM purchasing the property at this point would be a remote and speculative possibility, not an alternative that must be considered. *Custer Cnty. Action Ass'n*, 256 F.3d at 1039–40.

Supp. at 24–25.)   The Collaborate cites to no law or regulation that it contends Defendants violated in limiting public participation and the record shows that USPS provided notice directly to the Collaborate about its preparation of the EA and solicited its comments in response.  (AR004897.)  The Collaborate submitted such comments and the FONSI directly responded to them.  (AR005157–58.)  USPS is only required to solicit and consider "information and views" from the public "where there is a substantial likelihood of significant effects on the environment."  39 C.F.R. § 775.10(b).  Here, USPS concluded that there was no such significant effect on the environment but nevertheless solicited the Collaborate's participation.

CAM likewise faults USPS for not holding a public hearing on the EA.  (CAM Reply at 7.)  A public hearing is required "whenever appropriate," such as when there is "[s]ubstantial environmental controversy concerning the proposed action or substantial interest in holding the hearing."  40 C.F.R. §  1506.6(c).  Although the regulations do not differentiate between the public involvement requirements when an agency conducts an EA rather than a full EIS, "they afford agencies considerable discretion to decide the extent to which such public involvement is 'practicable.'"  *Brodsky*, 704 F.3d at 121 (quoting 40 C.F.R. § 1501.4(b)).  "When the exercise of that discretion is challenged on appeal, the reviewing court properly considers whether the lack of public input prevented the agency 'from weighing all the factors essential to exercising its judgment [under NEPA] in a reasonable manner.'"  *Id.* (quoting *Friends of Ompompanoosuc,* 968 F.2d at 1557).  Because USPS received comments only from CAM and the Collaborate, the agency reasonably concluded that there was no "substantial environmental controversy,"

and, in any event, the lack of a public hearing did not prevent USPS from weighing the relevant environmental considerations given Plaintiff's detailed written submissions.

The Collaborate also contends that USPS failed to evaluate "the cumulative effects of its national initiative to sell other USPS postal facilities throughout the country." (Collaborate's Mem. Supp. at 25.)  "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.  Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. § 1508.7.  The EA defined the relevant geographic area for evaluating cumulative impacts as "downtown Stamford" (EA at 23) and identified potential cumulative impacts as (1) air quality, (2) socioeconomic, (3) visual resources/aesthetics, (4) transportation, (5) noise, and (6) community services and utilities.  (*Id.*).  While the Collaborate contends that USPS should have looked nationally at its concerted efforts to dispose of property, the "identification of the geographic area within which [cumulative impacts] may occur, is a task assigned to the special competency of the appropriate agencies."  *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976).  The Collaborate does not identify any other specific post office sales that Defendants should have considered in conjunction with this review and Defendants reasonably concluded that the relevant geographic area for evaluating cumulative impacts was downtown Stamford rather than the nation as a whole.

Finally, the Collaborate contends that USPS's FONSI was arbitrary and capricious because it concluded that the proposed action would result in no significant

20

environmental impact on the bases of a "speculative" determination that "future local permits and approvals" would "mitigate impacts and support a determination of no significant impact, rather than providing independent analysis of the potential impacts and identification of the mitigation measures as required by NEPA."  (Collaborate's Mem. Supp. at 26.)  USPS contends, however, that it did not issue a "mitigated FONSI" (Defs.' Mem. Supp. at 38), which "occurs when an agency or an involved third party agrees to employ certain mitigation measures that will lower the otherwise significant impacts of an activity on the environment to a level of insignificance.  In this way, a FONSI could be issued for an activity that otherwise would require the preparation of a full-blown EIS." *Spiller v. White*, 352 F.3d 235, 241 (5th Cir. 2003).

Rather, USPS contends that "[t]he reference was a disclosure of potential environmental effects, not a mitigation requirement" and that it reasonably determined that "given permitting and local regulatory requirements and the limited information the Postal Service had regarding the likely buyer's redevelopment plans, the planned sale . . . . would not result in significant impacts to the human environment." (Defs.' Mem. Supp. at 39.)

The PI Ruling established that USPS could not simply ignore the reasonably foreseeable post-sale uses of the Atlantic Street Station.  USPS responded by conducting an EA and examining Cappelli's proposed development plans on a number of environmental indicators, including air qualify, water, historical and archaeological resources, and transportation.  (AR005145–50.)  While USPS was required to consider these reasonably foreseeably post-sale uses of the property, the scope of the relevant major federal action is still narrow: the sale, not development, of the Atlantic Street

21

Station.  The Court's review is "procedural" and its role is to ensure that USPS considered these potential environmental effects impacts, not to evaluate the substance of its decisions.  *See Friends of Ompompanoosuc*, 968 F.2d at 1556.  Because USPS has now properly considered potential environmental consequences of the sale, its motion for summary judgment as to the NEPA claim is granted.

> **B.  NHPA[12]**

>> *1.  Section 106*

NHPA "has a fairly broad mandate, in keeping with the longstanding Congressional interest in historic preservation" and "'requires each federal agency to take responsibility for the impact that its activities may have upon historic resources, and establishes the Advisory Council on Historic Preservation . . . to administer the Act.'" *Bus. & Residents Alliance of E. Harlem*, 430 F.3d at 590 (quoting *Nat'l Mining Ass'n v. Fowler,* 324 F.3d 752, 755 (D.C. Cir. 2003)) (alterations in original).

Section 106 of NHPA requires that federal agencies "take into account the effect of [any] undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register [of Historic Places]." 16 U.S.C. § 470f.

---

[12] In *Bus. & Residents Alliance of E. Harlem v. Jackson*, 430 F.3d 584, 590 (2d Cir. 2005), the Second Circuit declined to address whether a private right of action exists under the NHPA or whether courts instead review agency action under the APA, because it was "a statutory question rather than one of Article III jurisdiction" that it "need not resolve . . . where the case can otherwise be resolved in the defendants' favor."  Although USPS maintains that the NHPA does not apply to it, it "voluntarily follows, as matter of policy, the procedures set forth in Section 106 when undertaking real property disposals" (Defs.' Mem. Supp. at 20), and has adopted regulations to ensure compliance with Section 106, *see* 39 C.F.R. § 241.4(d).  As in *Bus. & Residents Alliance of E. Harlem*, the Court concludes that Plaintiffs' NHPA challenge fails on the merits and thus the Court need not address the statutory cause of action.

"Section 106 is therefore primarily procedural in nature.  It does not itself require a particular outcome, but rather ensures that the relevant federal agency will, before approving funds or granting a license to the undertaking at issue, consider the potential impact of that undertaking on surrounding historic places.  As such, courts have sometimes referred to Section 106 as a 'stop, look, and listen' provision."  *Bus. & Residents Alliance of E. Harlem*, 430 F.3d at 591 (internal citation omitted).  If the undertaking in question "is a type of activity that does not have the potential to cause effects on historic properties," an agency "has no further obligations under Section 106." 36 C.F.R. § 800.3(a)(1).

The regulations implementing the NHPA require agencies "to consult with state historic preservation officers ('SHPOs'), make reasonable and good faith efforts to identify historic properties, determine their eligibility for listing in the National Register of Historic Places, and assess the effects of a project on such properties."  *Pres. Coal. of Erie Cnty. v. Fed. Transit Admin.*, 356 F.3d 444, 447 (2d Cir. 2004).  An adverse effect exists when "an undertaking may alter, directly or indirectly, any of the characteristics of a historic property . . . in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." 36 C.F.R. § 800.5(a)(1).  The agency is required to notify and solicit comment from the Advisory Council on Historic Preservation, *see* 16 U.S.C. § 470f, and consult with the appropriate SHPO "to develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties." 36 C.F.R. § 800.6(a).  If the agency finds that "the undertaking will have no effect upon" historic properties, it is required to provide documentation of this finding to SHPO and if SHPO

does not object within 30 days, the agency's "responsibilities under section 106 are fulfilled." 36 C.F.R. § 800.4(d)(1)(i).

Here, USPS determined that with the protection of a Preservation Covenant the planned sale of the property would not result in any adverse effects to the Atlantic Street Station's historic features.  AR002079–81.  The Preservation Covenant prohibited all future owners from making "exterior construction, alteration, or rehabilitation" affecting "the historic features of the property" without SHPO's express permission but permitted the demolition of the 1939 addition.  (*See* Rouse Aff. ¶¶ 9–10 & Ex. 5 ¶ 2.)  When USPS undertook to sell the Atlantic Street Station, on April 12, 2011, USPS sent a draft Preservation Covenant to SHPO, which returned a copy of this letter to USPS on June 22, 2011 with a stamp marked "CONCUR" on the first page.  (AR02100–05.)  Thus, with SHPO's concurrence, the agency's obligations under Section 106 were fulfilled.  *See* 36 C.F.R. § 800.4(d)(1)(i).

The Collaborate contends that USPS's conclusion that the Preservation Covenant was sufficient to ensure that the sale would have no potential adverse impacts was arbitrary and capricious, because the Covenant allows for destruction of the 1939 annex and does not protect the interior of the 1916 structure.  (Collaborate's Mem. Supp. at 33–34.)  Because Section 106 entrusts USPS to make the determination of whether its actions will have an adverse effect, judicial review of this determination is under a deferential "arbitrary and capricious" standard.  *See Neighborhood Ass'n Of The Back Bay, Inc. v. Fed. Transit Admin.*, 463 F.3d 50, 59 (1st Cir. 2006) ("[W]e owe deference to the FTA's no adverse effect finding under sections 106 and 110, since the FTA has jurisdiction to make the finding, even though it does not have interpretive authority.").

In determining that the Preservation Covenant would ensure that the sale would have no adverse effect, USPS cited 36 C.F.R. § 800.5(2)(vii), which provides as an example of an adverse effect, the "sale of property out of Federal ownership or control *without* adequate and legally enforceable restrictions or conditions to ensure long-term preservation of the property's historic significance." (emphasis added). Thus, there is no adverse effect if adequate legal protections ensure preservation of the historic attributes of the property. Because the National Register of Historic Places nomination form focuses on the façade and other exterior features of the building, Defendants' determination that these features were the historically significant ones and that the Preservation Covenant was adequate to protect them was not arbitrary and capricious.

## C.      Sections 110 and 111 of the NHPA

Plaintiffs also challenge USPS's failure to comply with Sections 110 and 111 of the NHPA. Section 110 requires federal agencies to establish a "preservation program for the identification, evaluation, and nomination to the National Register of Historic Places, and protection of historic properties" and to ensure that such a program is carried out in consultation with local governments. 16 U.S.C. § 470h-2. The Collaborate contends that USPS lacks such a program, because it could not be found in its "Guide to Real Property Acquisitions and Related Services." (Collaborate's Mem. Supp. at 30.) However, in response to the Collaborate's claim, USPS has clarified that a separate document, its "Facilities Environmental Guide sets a framework for personnel to follow in considering facilities-related activities." (Defs.' Mem. Supp. at 29 (citing AR000570–591).) Plaintiffs do not challenge the sufficiency of this document in their reply breif. Furthermore, the House Report for Section 110 states that it "clarifies and codifies the minimum

responsibilities expected of Federal agencies in carrying out the purposes of this Act," but "is not intended to change the preservation responsibilities of Federal agencies as required by any other laws." *Lee v. Thornburgh*, 877 F.2d 1053, 1057 (D.C. Cir. 1989) (quoting H.R.Rep. No. 1457, 96th Cong., 2d Sess. 36 (1980)).  Thus the Collaborate has not identified any legal basis for challenging USPS's Section 110 compliance nor shown USPS's failure to comply.

> Section 111 provides that federal agencies
>
> shall, to the extent practicable, establish and implement alternatives for historic properties, including adaptive use, that are not needed for current or projected agency purposes, and may lease an historic property owned by the agency to any person or organization, or exchange any property owned by the agency with comparable historic property, if the agency head determines that the lease or exchange will adequately insure the preservation of the historic property.

16 U.S.C. § 470h-3(a).  Plaintiffs contend that because there is no record that Defendants considered leasing the property rather than selling it, they failed to comply with Section 111.  While requiring agencies, where practicable, to establish alternatives for historic properties, the statute explicitly provides only that an agency "may" lease properties and its legislative history confirms it "authorizes Federal agencies to lease or exchange any agency-owned property . . . . so that agencies that wish to maintain ownership of an historic property may assure its continued preservation."  H.R. Rep. No. 96-1457, 96th Cong., 2d Sess. 39 (Oct. 10, 1980).  Thus, even if Plaintiffs could bring a claim for a

violation of Section 111(a), it is only an authorization for agencies to lease property and does not require consideration of a specific given transaction.[13]

### D.    Motion to Strike

Finally, Defendants move [Doc. # 118] to strike three exhibits that the Collaborate has submitted: (1) an April 16, 2014, audit report from the United States Postal Service Office of the Inspector General (Ex. 36 to Loc. Civ. R. 56(a)1 Stmt.); (2) an April 17, 2014, report from the Advisory Council on Historic Preservation (Ex. 37); and (3) a February 2014 General Services Administration Fiscal Year 2013 Performance Overview (app'x to Collaborate's Mem. Supp.)   The Collaborate contends that Inspector General and Advisory Council reports "demonstrate that the USPS did not consider all the environmental consequences and adverse impact of its proposed action even though the Collaborate raised these issues in its Response to the EA."  (Collaborate's Mem. Supp. at 19.)   The Collaborate contends that both reports document USPS's deficiencies in complying with the NHPA in disposing of properties.  As the Collaborate acknowledges

---

[13] In *Committee for Preservation of Seattle Federal Reserve Bank Building v. Federal Reserve Bank of San Francisco*, 2010 U.S. Dist. LEXIS 26084 at *19 (W.D. Wash. Mar. 19, 2010), a district court adopted a contrary conclusion and held that the Federal Reserve "should have considered adaptive use and/or a lease arrangement before deciding to transfer ownership of [its] historic property to a third party."  Although the court noted "that no court has ever set aside agency action because the agency violated § 111," it held that the Federal Reserve's failure "to at least consider, if not implement, adaptive use or lease strategies to protect historic properties" was a violation of NHPA and justified setting aside the sale.  *Id.*  The Court declines to adopt this reasoning in light of the absence of a clear statutory directive to do so.

both of these reports were released after the EA and FONSI in this case were issued.[14]  (*Id.* at 20.)

"Generally, a court reviewing an agency decision is confined to the administrative record compiled by that agency when it made the decision. . . .  Despite the general 'record rule,' an extra-record investigation by the reviewing court may be appropriate when there has been a strong showing in support of a claim of bad faith or improper behavior on the part of agency decisionmakers or where the absence of formal administrative findings makes such investigation necessary in order to determine the reasons for the agency's choice."  *Hoffman*, 132 F.3d at 14.  Deviation from this rule "occurs with more frequency in the review of agency NEPA decisions than in the review of other agency decisions," because NEPA imposes a duty on federal agencies to compile a comprehensive analysis of the potential environmental impacts of its proposed action, and review of whether the agency's analysis has satisfied this duty often requires a court to look at evidence outside the administrative record."  *Id.* at 14–15.  "Nonetheless, deviation from the record rule, even in the review of NEPA decisions, is limited."  *Id.* at 15.

The Collaborate contends that consideration of these materials outside the record is appropriate "because the absence of USPS['s] findings on the cumulative impact of the sale of historic post offices in the EA and FONSI make it necessary to investigate the reasons for the agency's findings."  (Collaborate's Mem. Supp. at 21.)  However, the Court

---

[14]  Neither party addresses the GSA report, which is cited in support of the Collaborate's argument that the EA failed to take a hard look at using the GSA to dispose of the property.  (Collaborate's Mem. Supp. at 37.)

has already concluded that USPS appropriately analyzed cumulative impacts in the downtown Stamford area only and thus there was no "bad faith or improper behavior" by the agency.  *Hoffman*, 132 F.3d at 14.  Furthermore, there is not an "absence of formal administrative findings," which "makes such investigation necessary in order to determine the reasons for the agency's choice," *id.*, because the administrative record already contains the Collaborate's objection and Defendants' response explaining its decision to not consider national cumulative impacts in the EA.  (AR004949; AR004960; AR05169–70.)   Accordingly, consideration of extra-record materials is neither appropriate nor necessary and therefore Defendants' Motion to strike is granted.[15]

## IV.   Conclusion

For the reasons set forth above, Defendants' Motion [Doc. # 119] for Summary Judgment and Motion [Doc. # 127] to Strike are GRANTED; the Collaborate's Motion [Doc. # 111] for Summary Judgment is DENIED.  The previously entered Preliminary Injunction [Doc. # 52] is dissolved and the Clerk is directed to close this case.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 26th day of November, 2014.

---

[15] Additionally, neither report has any discussion of the Atlantic Street Station (the Advisory Council report notes the sale and that a Section 106 review was completed; the Inspector General report does not mention it at all).

29